## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## WACO INSULATION, INC., Respondent.

### No. 76–2223.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 3, 1977.

Decided Dec. 14, 1977.

Howard F. Fine, Atty., N. L. R. B., Washington, D. C. (Marion Griffin, Atty., N. L. R. B., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., on brief), for petitioner.

Melvin R. Manning, Richmond, Va. (John W. Pearsall, III, McCaul, Grigsby & Pearsall, Richmond, Va., on brief), for respondent.

Before BRYAN, Senior Circuit Judge, and RUSSELL and HALL, Circuit Judges.

K. K. HALL, Circuit Judge:

This is a petition for enforcement of an order of the National Labor Relations Board against Waco Insulation, Inc. The issues presented arise from the dismissal of two Waco employees on July 16, and July 17, 1975, respectively, and the unfair labor practice charges they filed thereafter.

The Administrative Law Judge found that employee Douglas Rexrode (Rexrode)

was discharged because of protected concerted activity. He acted as spokesman for a group of employees demanding a pay raise, and shortly thereafter was discharged. Back pay was awarded, but not reinstatement since Waco had later reinstated Rexrode who thereafter quit voluntarily. The N.L.R.B. agreed with the back-pay award but held that it was not clear that Waco's offer of reinstatement was unconditional, and accordingly ordered reinstatement also.

The Administrative Law Judge found that employee Paul Kuykendall (Kuykendall) had not engaged in protected concerted activity, regarding his requests for a pay raise, and accordingly denied all relief. The N.L.R.B. disagreed, awarded back pay, and ordered reinstatement.

In each case, the N.L.R.B. found that Waco had violated Section 8(a)(1) of the Labor Management Relations Act of 1947, 29 U.S.C. § 158(a)(1).

The only question presented here is whether the board's findings are supported by substantial evidence on the whole record even if we might have resolved the questions differently. *N.L.R.B. v. Pilot Freight Carriers, Inc.*, 558 F.2d 205, 207 (4th Cir. 1976). We enforce in part and deny in part the Board's order.[1]

I

The Discharges

Waco Insulation, Inc. (Waco), a general contractor, was working at the Mt. Storm, West Virginia power plant of the Virginia Electric and Power Company (Vepco) pursuant to a contract to pressurize and repair the No. 2 boiler. The assembly of a work crew began in May, 1975, and welders and riggers, among others, were hired. Rexrode was hired on July 2, 1975, as a welder and was fired on July 16, 1975. Kuykendall

was hired on May 2, 1975, as a rigger and was fired on July 17, 1975.

At a morning break on Wednesday, July 16, 1975, approximately four or five employees, including the two dischargees, were in the lunchroom area of Boiler Unit # 2 on the tenth floor when the topic of conversation turned to wages. This group decided to ask for a pay raise and informally selected Rexrode to be their spokesman. They left the lunchroom and proceeded up the stairs toward the eleventh floor where they met Robert E. Talbott (Talbott), their foreman, who inquired of their purpose. Rexrode told him that they needed more money. Talbott agreed with the men, and produced a tablet which contained a listing of their names and stated he wanted to put them in for a raise.

Rexrode, as spokesman for the group, pressed Talbott for an immediate answer— one that day. Talbott then gave the men the choice of either returning to work or returning to the lunchroom for a meeting with William J. Belanich (Belanich) the senior supervisor on the job for Waco whom Talbott would call. All the employees returned to the lunchroom except Kuykendall, who returned to work but asked Talbott to call him when Belanich arrived.[2]

Superintendent Belanich arrived at the lunchroom and asked the men what the difficulty was. Rexrode, as spokesman for the group, presented their case stating that they needed more money because they were more skilled than other welders on the job who were receiving equal pay with them. Belanich stated that he was considering a test for the welders which Vepco would conduct and if the employees passed the test, they would be "first-class welders" and receive higher pay. Belanich planned to discuss the test with a Vepco superintendent and planned to let the men know something on Friday (July 18, 1975) when the Vepco representative was in the Mt. Storm area.

1. The Board's decision and order are reported at 223 N.L.R.B. No. 219 (May 17, 1976).

2. Talbott did not call Kuykendall when Belanich arrived and accordingly Kuykendall missed this meeting.

Various of the employees wanted to wait until Friday, but Rexrode persisted and insisted on something definitive at that time. He argued that he had already passed one welder's test, did not want to take another test, and desired to know something definite immediately. The tenor of the conversation escalated and became heated. Ultimately Belanich told the men they had five minutes to return to work "or else." The entire meeting lasted one hour.

Rather than quit, the men returned to work. The evidence conflicts somewhat, but later on Wednesday afternoon Belanich and Junkins, another foreman, saw Rexrode talking to his co-workers and he was assertedly not performing his job as well as he had previously. Belanich then came by Rexrode's location at 3:30 p.m. and told him to stop by the office at quitting time. When he arrived, Belanich gave him his pay check and fired him. Rexrode thereafter filed an unfair labor practice charge against Waco.

On July 17, 1975, the morning after Rexrode was fired, Kuykendall saw Talbott and asked him about *his* request for a raise. He was told that Belanich was still "pretty upset from the day before," to "keep cool for a couple of weeks," "not to say anything about [it]," and the issue would come up later. After lunch, Talbott told Kuykendall that Belanich wanted to see him. Kuykendall met Belanich, responded to his questions, and told him that his problem was money. Belanich accused Kuykendall of discussing Rexrode's discharge with other co-workers, and fired him too. Belanich prepared Kuykendall's pay check at that time. Kuykendall thereafter filed an unfair labor practice charge against Waco.

Both dischargees apparently remained off work from Waco from their respective discharges until August 26, 1975, when they were voluntarily reinstated by Waco. However, both employees voluntarily quit almost immediately thereafter.[3]

---

**3.** None of the other Waco employees involved in the July 16 meeting were discharged.

## II
### The Protected Concerted Activity
#### A
##### Douglas Rexrode

The N.L.R.B. contends that Rexrode was discharged for protected concerted activity—asking for a wage increase on behalf of the group he was with during the meetings with Talbott and then Belanich. Waco contends that Rexrode was discharged for cause because: (a) he was unreasonable in demanding a pay increase after being on the job for only two weeks; (b) because he acted in an insubordinate manner during the lunchroom confrontation; and (c) because he failed to properly perform his job in the afternoon following the lunchroom confrontation. We agree with the Board.

■ The "reasonableness" of Rexrode and his co-workers' decision to present their demands for a wage increase shortly after they were hired is irrelevant to a determination of whether Rexrode was engaged in protected concerted activity. *N.L.R.B. v. Washington Aluminum Company*, 370 U.S. 9, 16, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962). While perhaps imprudent, Rexrode's conduct was not unlawful, violent, in breach of contract,[4] or indefensible, and was protected activity. *See N.L.R.B. v. Washington Aluminum Company*, 370 U.S. 9, 17, 82 S.Ct. 1099, 8 L.Ed.2d 298.

■ The record does not support Waco's allegations of insubordination by Rexrode. Only once, and that was in response to a leading question, did Belanich characterize Rexrode's conduct as insubordinate. Rexrode did not defy any work order by one of his superiors. While he initially refused to return to work during the lunchroom confrontation, he did so in the context of concerted protected activity. When given a choice of quitting or returning to work, he returned to work. Although the discussion became loud, this alone was not enough to constitute insubordination. What the record does reflect, and quite clearly is that a major factor in the discharge of Rexrode

---

**4.** See part III, *post* of this opinion for a discussion of the inapplicability of the collective bargaining agreement in this case.

was his request for a pay raise [5] which is protected activity. *N.L.R.B. v. Kennametal, Inc.*, 182 F.2d 817 (3rd Cir. 1950); *Neptune Water Meter Company v. N.L.R.B.*, 551 F.2d 568, 569 (4th Cir. 1977); *N.L.R.B. v. Hanes Hosiery Division, Hanes Corp.*, 413 F.2d 457, 458 (4th Cir. 1969); *N.L.R.B. v. Smith Victory Corp.*, 190 F.2d 56 (2nd Cir. 1951).

Finally, as the testimony quoted in the margin illustrates, the real reason for Rexrode's dismissal did not turn upon his unsatisfactory work performance and socializing with his co-workers during the afternoon of July 16th. While we have held for example that: "[p]revention of interference with the work of others while they are busy is a common requirement in industrial plants," *N.L.R.B. v. Hanes Hosiery, supra*, at p. 458, we also have held that "business reasons may not be used as a pretext for a discriminatory firing. *N.L.R.B. v. Hanes Hosiery, supra*, at p. 458.

Substantial evidence supports the Board's order concerning the discharge of Rexrode.

### B

### Paul Kuykendall

Even though Kuykendall missed the lunchroom confrontation with Belanich, the N.L.R.B. contends that he also was engaged in protected concerted activity. Waco contends that he was discharged for cause: (a) because of a history of unsatisfactory job performance, and (b) because of repeated requests for higher wages and complaints about his working conditions. The Administrative Law Judge held that Kuykendall's actions were not protected: (a) because his four previous requests for a wage increase came before the group demand on July 16 for higher pay and each request was individual in nature; (b) because Kuykendall was a rigger, not a welder, and had the welders secured a raise, Kuykendall probably would not have gotten one; (c) because Kuykendall was not present during confrontation on July 16th *with Belanich*; and, (d) because his final pay increase request came on July 17th, again individually. We disagree with these contentions and agree with the Board that dismissal of Kuykendall was improper.

■ While it is true that Kuykendall was not present when Belanich arrived at the lunchroom on July 16th, it is also true that he had voluntarily joined with the welders and collectively confronted foreman Talbott requesting a pay raise. Only because Talbott failed to call him back from work did he miss the meeting with Superintendent Belanich. His discussions, voluntary joinder and his participation with the welders in their initial group confrontation with foreman Talbott on July 16th was sufficient to establish concerted protected activity under Section 7 of the Labor Management Relations Act of 1947, 29 U.S.C. § 157. *Mushroom Transportation Company v. N.L. R.B.*, 330 F.2d 683, 685 (3rd Cir. 1964).

■ Next, while it is true that Kuykendall's work performance had been unsatisfactory at times in the past, there were no complaints about his performance during

---

5. Superintendent Belanich testified:

Q. Now, do you recall during the conversation you had with Doug Rexrode at the end of the day on July 16th telling Mr. Rexrode that he had been unreasonable in demanding a raise and that his work was not up to par?
A. Yes.
Q. Do you recall telling him which of those two reasons was the more important reason?
A. No, I didn't tell him. [T–55].
He further testified:
Q. * * *
A. He came down to the office on the way out and I talked with Mr. Talbott and I told him, I said, "Doug, your performance is not up to par. You are very unreasonable by your asking this morning for a raise right now; this is very unreasonable of you. You were very excited about it. And you can't perform like that. It would be best that we part our ways." [T–57].
On a third occasion, Belanich recapped:
* * * And when he came to the office, I said, "Well, Doug, I believe you were a bit unreasonable this morning; and I think that you are a guy that would carry this on—a grudge on and you wouldn't be able to perform, just as you were not able to perform this afternoon. I think the best thing is that we part company." [T–225].

the two week period prior to his discharge.[6] Further, when he was summoned to Belanich's office on July 17 and fired, he was not told that he was being discharged for his allegedly poor work performance.[7] We believe that it is extremely unlikely that the reason for Kuykendall's discharge was due to poor work performance since it was not articulated as a reason for his discharge at the time he was fired. *N.L.R.B. v. Smith Victory Corp.,* 190 F.2d 56, 57 (2nd Cir. 1951). Belanich's testimony supports this conclusion since he conceded that had Kuykendall not asked for a raise he did not know whether he still would be employed or not.

Finally, Kuykendall was dismissed also because he admittedly had made inquiry among his co-workers about the discharge of Douglas Rexrode.[8] Such discussions by Kuykendall constituted protected

concerted activity. *N.L.R.B. v. Hanes Hosiery Division, Hanes Corp.,* 413 F.2d 457, 458 (4th Cir. 1969); *see also Owens-Corning Fiberglas Corporation v. N.L.R.B.,* 407 F.2d 1357, 1365 (4th Cir. 1969).

Substantial evidence supports the Board's order concerning the discharge of Kuykendall.

### III

### The Collective Bargaining Agreement

During the hearing before the Administrative Law Judge, Waco introduced a collective bargaining agreement between itself and the United Steelworkers which agreement covered the term from June 1, 1974, until June 1, 1977, and which could seem to encompass the work to be performed by Waco at the Mt. Storm plant, and could further cover the discharges

6. Kuykendall was first reprimanded during his second week of work for improperly rigging a hoist. Then, on June 1, 1975, due to a lack of rigging work, Kuykendall was transferred to a labor crew.

    Prior to July 1, 1975, Belanich had an office conference with Kuykendall about his unsatisfactory performance while he was serving as a laborer but earning rigger's wages.

    After July 1, 1975, when Kuykendall was returned to a rigging crew, a buck hoist which Kuykendall had helped rig, slipped. Belanich, passing by, mentioned that that incident should not have occurred, but it was admitted that the error might have been the fault of other co-workers.

    Indeed, when the group, including Kuykendall, confronted Talbott about the wage raise, they *all* were told they were doing a good job and deserved a raise.

7. Kuykendall testified that when he asked Talbott about his raise before noon on July 17, 1975, Talbott responded:

    A. Yes, he said he would talk to Mr. Belanich, or that he talked to Mr. Belanich and he come back and gave me the report that Mr. Belanich said to just keep cool for a couple of weeks and not to say anything more about the raise because he was pretty upset from the day before, and he would think about it, then. [T–129].

    After lunch, when Kuykendall was summoned to Belanich's office the focus was in part financial. Kuykendall testified:

    A. Well, he [Belanich] wanted to know what my problem was.
    Q. What did you say?

A. I told him the only problem I had was the problem with the money.
Q. Did Mr. Belanich answer your response in any way?
A. Well, he wanted to know that I specifically meant; and I told him I thought I needed more money. And he said around here, you don't ask for a raise; I will give you a raise when I see you deserve a raise. [T–130].

8. Kuykendall's version follows:

    A. [Belanich said] that he had been informed that after dinner, that I was talking to a few of the guys trying to start trouble again.
    Q. Did he explain what he meant by trouble?
    A. No, he didn't. He just said I had been heard talking about Doug getting fired the day before; and I admitted that I had been talking to Allen Rexrode [Doug's cousin] about it.
    Q. About the question of Doug's being fired?
    A. Right.

    \* \* \* \* \* \*

    A. [Belanich] said he didn't think it was right, that it was none of my business, in other words, why he had fired Doug, that it shouldn't concern me.
    Q. Is that what he said to you?
    A. Yes.
    Q. And do you recall if he said anything else to you?
    A. He told me he thought it was time for me and him to part company; and he wrote me one check out. [T–131].

which resulted in this litigation. Also introduced was a supplemental memorandum of agreement setting the wage rates for first and second class welders, riggers and laborers, but this document was dated September 26, 1975, *after* the discharges in question.[9]

Waco contends that both Rexrode and Kuykendall were told of the existence of the agreement when they were hired, but when the problems arose concerning their pay requests, neither Rexrode nor Kuykendall followed the contractual procedures set forth in the agreement. Since the employees failed to follow the contractually mandated procedure for settling disputes and in essence were seeking to alter the pay classifications set forth in the collective bargaining agreement, Waco contends that their conduct was not concerted protected activity.[10] Both dischargees disavowed knowledge of the existence of a union when hired and knowledge of any rights or duties under the contract.

The Administrative Law Judge resolved the applicability of the collective bargaining agreement against Waco, and the Board affirmed. We agree with the Board and hold that substantial evidence exists in the record to demonstrate that Waco had not told Rexrode or Kuykendall of the collective bargaining agreement when they were hired or when they were discharged. It was not mentioned in the lunchroom confrontation meetings on July 16th and President Walker admitted that in June, 1975, the percentage of union employees at Mt. Storm was very small. Toward the end of July, after the discharges, the percentage had only risen to 10–15%. Accordingly, absent knowledge of the collective bargaining agreement between Waco and the Steel-

workers Union, the spontaneous work stoppage by Rexrode, Kuykendall and the other welders to present their wage demands to management constituted a protected concerted activity. *N.L.R.B. v. Kennametal, Inc.*, 182 F.2d 817, 818 (3rd Cir. 1950); *United Merchants and Manufacturers, Inc. v. N.L.R.B.*, 554 F.2d 1276, 1278 (4th Cir. 1977); *N.L.R.B. v. Serv-Air, Inc.*, 401 F.2d 363, 365 (10th Cir. 1968).

## IV

### The Remedy

The Administrative Law Judge did not include a provision for reinstatement in his recommended order: (a) because Waco had offered reinstatement to the two dischargees; (b) because President Walker of Waco had assured both men of fair treatment upon reinstatement; and (c) because both men, once reinstated had voluntarily quit their jobs shortly thereafter.[11] The Board disagreed holding that reinstatement was required since there was not enough evidence in the record to find that Waco made unconditional offers of reinstatement to Rexrode or Kuykendall. We disagree with the Board.

After the two employees were discharged, and pursuant to negotiations with a Mr. Graham of the N.L.R.B., Walker sent Rexrode and Kuykendall telegrams "reinstating them in their jobs at the pay that they left at and doing similar work."[12] Approximately a week after the telegrams were sent, Walker saw the two dischargees at the plant in a meeting with Superintendent Belanich. At Belanich's request Walker joined the meeting, and as President of Waco, personally assured both men that

---

**9.** Other correspondence occurring during September and October, 1975, was introduced by Waco to attempt to buttress its position that the collective bargaining agreement and its addendum covered the dischargees in this case.

**10.** William Walker, President of Waco, testified that an oral agreement as to the wage rates set forth in the supplemental memorandum agreement was reached with the United Steel Workers in March of 1975 prior to the discharges of Rexrode and Kuykendall, but this was not me-

morialized until September 26, 1975, after the two were discharged.

**11.** See Part I *supra*.

**12.** While the telegrams were not made a part of the record below, the uncontroverted testimony on this point, together with Walker's testimony as a whole, discloses that the offers of reemployment were in fact unconditional.

upon their return to work, they would be treated fairly.[13] The men were in fact reinstated on August 26, 1975, however, both men voluntarily quit almost immediately thereafter.

The Board argues that we should enforce its order concerning reinstatement leaving the question of whether in fact Rexrode and Kuykendall were made and accepted unconditional offers of reinstatement for the compliance stage of these proceedings relying upon our decision in *Solo Cup Company v. N.L.R.B.*, 332 F.2d 447, 449 (4th Cir. 1964); *see also Home Beneficial Life Insurance Company, Inc. v. N.L.R.B.*, 172 F.2d 62, 63 (4th Cir. 1949).

While the Board correctly states the general rule, our review of the record discloses no substantial evidence to support the finding that Waco did not offer Rexrode and Kuykendall unconditional reinstatement which, indeed they accepted. Accordingly, we hold that an illegally discharged employee loses his claim for reinstatement against the discharging employer where he has been unconditionally offered reemployment, accepts it, and voluntarily quits thereafter. *See N.L.R.B. v. Huntington Hospital, Inc.*, 550 F.2d 921, 924–5 (4th Cir. 1977).

■ We further hold that both dischargees are entitled to back pay, but such awards must be limited to the periods between the respective discharges of Rexrode and Kuykendall, and their reinstatement by Waco. *N.L.R.B. v. Huntington Hospital, Inc.*, 550 F.2d 921, 924.

The Board's order is

ENFORCED, in part; and DENIED in part.

---

**13.** Walker testified:

"And they closed the door and I didn't go in there. But after a few minutes, [Belanich] asked me to come in and the problem apparently was that they wanted to be assured that in coming back to work, that they would be treated fairly. And my conversation with them was pretty simple, that they had my word that they would be treated fairly, that my foremen and superintendent would be instructed to do everything they could do to make sure they were treated fairly; and that was the end of the conversation." [T–201].