884 F.2d 1387
 132 L.R.R.M. (BNA) 2240
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
ARTHUR YOUNG & COMPANY, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 88-3640.
 United States Court of Appeals, Fourth Circuit.
 Argued May 8, 1989.
Decided Aug. 28, 1989.
 
 Elizabeth B. Healy (Carl D. Liggio, Jacqueline Steele on brief) for petitioner.
 Leizer Zalman Goldsmith (Rosemary M. Collyer, General Counsel, Robert E. Allen, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Charles Donnelly, Supervisory Attorney on brief) for Bloom and Cohen.
 Before WILKINSON, Circuit Judge, HAYNSWORTH, Senior Circuit Judge, and CHARLES H. HADEN, II, Chief United States District Judge for the Southern District of West Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 In this case we must determine if the National Labor Relations Board properly concluded that petitioner Arthur Young & Company violated the National Labor Relations Act by 1) adopting rules intended to curb employees' exercise of their Section 7 rights, and 2) discharging employees Bloom and Cohen for engaging in protected activities. We find that substantial evidence supports the Board's findings and enforce the Board's order.
 
 I.
 
 2
 Nina Bloom and Lisa Cohen worked for petitioner Arthur Young & Company for approximately six and two years, respectively. Both worked as proofreaders in the document processing center at the company's New York office. Their immediate supervisor was Sonia Flores. Flores' immediate supervisor was Ann Giardina, director of the Center.
 
 
 3
 Bloom and Cohen were average employees, receiving satisfactory grades in their annual evaluations. In November 1986, the firm hired two new proofreaders at wages higher than those received by Bloom and Cohen. Bloom and Cohen subsequently discussed the disparity among themselves and, on December 2, Bloom spoke to personnel administrator Judith Wayne about the situation. Wayne told Bloom to speak to Giardina. On the following day, December 3, Giardina issued written warnings to both Bloom and Cohen regarding past tardiness.
 
 
 4
 On January 12, 1987, Bloom and Cohen together went to see Alan Brott, director of personnel development. Brott agreed to review the matter and discuss it with Wayne. Approximately five weeks later Brott met separately with Bloom and Cohen and rejected their salary complaints. Around the same time, Bloom and Cohen met two other proofreaders for dinner and discussed, among other topics, the need to improve working conditions in the Center.
 
 
 5
 Shortly thereafter, Cohen and fellow employee Debbie Graham went to Wayne and complained about supervisory abuse. Wayne said she would look into these complaints. Cohen subsequently urged several other employees to take their complaints to management.
 
 
 6
 On February 24, Center employee Joyce Imbrosci told Flores that she had heard that the proofreaders planned to complain to the personnel department about managers of the Center, and that she was being "harassed" to join them. Flores repeated this information to Giardina, her immediate supervisor, and Flores and Giardina informed Wayne. A day later at a proofreaders' meeting, Wayne told the proofreaders that it was not "proper" to encourage other people to complain, that the firm would not tolerate strong arm or union-like tactics, and that she was aware of salary problems the firm was working to correct. After the meeting, Bloom told Giardina that "the real issue here is that Lisa [Cohen], Debbie [Graham], and I want more money."
 
 
 7
 The next day Ivy Leon, a proofreader, spoke with Giardina. She told Giardina that Bloom had made offensive racial and ethnic comments and identified Cohen as the "Norma Rae" of the Center. Giardina then met with other members of management where Bloom, Cohen, and Graham were mentioned as the people responsible for workplace disruptions. The work records of Bloom and Cohen were also discussed. Company partner Walter Wohlgemuth then decided that Bloom should be discharged. According to Wohlgemuth, he made his decision based on Bloom's disruptive behavior, her harassment of other employees, her alleged racial remarks, and the fact that she was a marginal employee. Giardina discharged Bloom that same day. She also discussed new work rules with the other proofreaders which prohibited unnecessary conversation at work.
 
 
 8
 Later that same day, Giardina confronted Cohen, stating that she was "aware of her activity to discredit department management." Giardina then spoke again to Leon, who confirmed that Cohen was the "Norma Rae" of proofreaders. On March 3, Giardina discharged Cohen.
 
 
 9
 Bloom and Cohen filed this action on March 30, 1987, and a complaint was issued on May 14, 1987 by the Director of Region 2 of the National Labor Relations Board. The complaint alleged that around February 26 or 27, 1987, Arthur Young & Company, by its supervisors, Wayne and Giardina, orally promulgated a rule prohibiting discussions among employees of the company's facility at any time. It also alleged that on February 27, 1987, and March 3, 1987, Arthur Young & Company discharged Bloom and Cohen, respectively, because they made complaints as to their wages and working conditions.
 
 
 10
 In an order, dated February 5, 1988, the ALJ found that petitioner imposed restrictions on workplace conversations so as to discourage concerted protected activities and that Bloom and Cohen were discharged for these activities. The ALJ ordered Arthur Young & Company 1) to cease and desist from discharging employees because of their exercise of rights guaranteed them by Section 7 of the National Labor Relations Act, and 2) to reinstate Bloom and Cohen to their former positions. On September 28, 1988, the NLRB adopted the Order of the ALJ. This appeal followed.
 
 II.
 
 11
 Section 7 of the National Labor Relations Act (NLRA) provides employees the right to join together to seek improved terms and conditions of employment, and to protect those already obtained. 29 U.S.C. Sec. 157. Correspondingly, Section 8 of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of their rights guaranteed in [Section 7]." 29 U.S.C. Sec. 158. An employer violates Section 8 by discharging or taking repressive measures against employees who attempt to exercise their right to self-organization. Community Hospital of Roanoke Valley, Inc. v. NLRB, 538 F.2d 607, 610 (4th Cir.1976); NLRB v. Hanes Hosiery Div., Hanes Corp., 413 F.2d 457, 458 (4th Cir.1969). The above sections apply to both organized and unorganized employees. NLRB v. Washington Aluminum Co., 370 U.S. 9, 14 (1962).
 
 A.
 
 12
 Petitioner contends that it adopted restrictions against employees talking at work not to discourage concerted activity, but solely "to enforce and maintain discipline in the workplace." Substantial evidence, however, supports the Board's conclusion that such restrictions were intended to curb employees' exercise of their Section 7 rights.
 
 
 13
 Generally, an employer may adopt rules to maintain workplace discipline. Standard-Coosa-Thatcher Carpet Yarn v. NLRB, 691 F.2d 1133, 1141 (4th Cir.1982). Employees, however, have the right under Section 7 to communicate "regarding self-organization at the jobsite." Beth Israel Hosp. v. NLRB, 437 U.S. 483, 491 (1978). Thus, while an employer may adopt a rule which prohibits employees from solicitation on working time, Republic Aviation Corp. v. NLRB, 324 U.S. 793, 795-803 (1945), "no restriction may be placed on the employees' right to discuss self-organization" during non-working time "unless the employer can demonstrate that a restriction is necessary to maintain production or discipline." NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 113 (1956).
 
 
 14
 Here, on February 27, the same day she discharged Bloom, Giardina informed each proofreader individually about new guidelines that had been adopted. She instructed the proofreaders that they were prohibited from further association among themselves at work unless such association was directly related to their work and, specifically, that they were prohibited from "socializing" and "congregating at each others' booths." The effect of these rules was essentially to prohibit any discussion among proofreaders that was not work related. Following the promulgation of the rule, employees who theretofore "spoke amongst [them]selves ... when there was free time" thereafter "kept to [them]selves" in fear of violating the rule. The fact that these rules were promulgated the day Bloom was discharged and just two days after Wayne had accused the proofreaders of instigating co-workers to raise complaints to higher management, denounced "union-like" tactics and rebuked Bloom's efforts to discuss proofreaders' salaries, leaves little doubt that the company's purpose in announcing the rules was to curb employees in the exercise of their Section 7 rights rather than to accomplish some legitimate objective.
 
 
 15
 Petitioner's contention that the new guidelines were permissible because they were not in response to employee conversations which "involved concerted activity" is without merit. The ALJ correctly found that the rule is invalid even if no known protected concerted activities have taken place because it tends to discourage such activities. Likewise, petitioner's claim that this rule was necessary to promote production and discipline is unpersuasive. The rule in practice encompassed non-working time. Moreover, the proofreaders tended to have some free time because the Center was not as busy in February as in many other months; hence fewer problems with production existed. The rule's timing tends to indicate its real purpose was not to spur production, but to suppress any potential concerted activities.
 
 B.
 
 16
 Petitioner asserts that neither Bloom nor Cohen were engaged in protected activity and that even if they were engaged in such activity, such activity was not the reason for their discharge. We, however, uphold the Board's finding that Bloom and Cohen were engaged in concerted protected activity and were discharged for that reason.
 
 
 17
 Two or more employees engaged in a common effort to achieve better working conditions do so in concert, and are entitled to Section 7 protection. NLRB v. City Disposal Systems, Inc., 465 U.S. 822, 831 (1984). Section 7, moreover, protects employee efforts at initiating, inducing, or preparing for group action; thus a single employee seeking to enlist the support of his fellow employees for their mutual aid and protection is engaged in concerted activity. NLRB v. Waco Insulation, Inc., 567 F.2d 596, 599 (4th Cir.1977).
 
 
 18
 Generally, Section 7 is violated whenever an employer discharges an employee for supporting a union or for engaging in other protected activity. However, if the employer can show that the discharge would have occurred regardless of the employee's protected activity, there is no violation of the Act. Salem Leasing Corp. v. NLRB, 774 F.2d 85, 87-88 (4th Cir.1985); NLRB v. Neuva Engineering, Inc., 761 F.2d 961, 967 (4th Cir.1985). See also Wright Line, a Div. of Wright Line, 251 NLRB 1083 (1980), enf'd on other grounds, 662 F.2d 899 (1st Cir.1981); McLean Trucking Co. v. NLRB, 719 F.2d 1226, 1228 n. 1 (4th Cir.1983). An employer can therefore justify his actions in a "mixed motive" case; however, if the employer's alleged lawful reasons for discharge are simply a pretext for carrying out unlawful discrimination, a finding that the employer has violated the Act is proper.
 
 
 19
 Here, Bloom and Cohen were engaged in protected concerted activity. In November 1986, Bloom and Cohen learned that two new proofreaders were being paid more than they were. Accordingly, Bloom went to Wayne to discuss the wage disparity, making clear that she was speaking both for herself and Cohen. On January 12, 1987, Bloom and Cohen together repeated their wage complaints to Brott. As petitioner concedes, and the ALJ correctly observed, such actions constituted concerted protected activity.
 
 
 20
 Bloom and Cohen were involved in additional concerted protected activities when they sought to enlist the support of other employees and bring work related problems to management's attention. In February 1987, Bloom, Cohen, and two other proofreaders discussed at dinner the need to improve working conditions at the Center. Several days later, Cohen and Debbie Graham, another proofreader, complained to Wayne about verbal abuse by their superiors. Following this discussion, Cohen encouraged other employees with problems to talk to Wayne. Finally, on February 25, 1987, Bloom spoke to Giardina following a proofreader's meeting and stressed that she, Cohen, and Graham all wanted more money.
 
 
 21
 Petitioner's contention that Bloom and Cohen's activities were not protected because they disrupted production is without merit. Bloom and Cohen's activities were protected; they were not "unlawful, violent, [a] breach of contract, or indefensible." Waco, 567 F.2d at 599. They merely sought to organize employee support in order to address perceived problems in the Center. Further, there is no indication that their activities disrupted production. As the ALJ found, there is no evidence that they "caused any work to be delayed or any deadline to be missed." Witnesses substantiated this finding.
 
 
 22
 Likewise, there is no merit to petitioner's argument that the discharges were a result of poor job performance. In October of 1986, at the end of her last evaluation period before her discharge, Bloom received the highest raise possible. Further, in four of the last five years of her employment, Bloom received nothing less than "satisfactory" in any of the fifteen performance categories, and on some evaluations, had been rated as "exceed[ing]" average expectations in the category labeled "Cooperation." Finally, Cohen's annual evaluations tended to grade her performance as "satisfactory."
 
 
 23
 Substantial evidence supports the Board's finding, moreover, that Bloom and Cohen were discharged for their protected activities. Bloom was discharged two days after Wayne warned employees about engaging in "union-like" activities. Cohen was fired a few days later after she was identified as the "Norma Rae" of the department. Additionally, Giardina admitted that her reason for firing Cohen was Cohen's participation "in the activity of soliciting others to complain" about working conditions. Giardina's memoranda regarding the discharges also makes clear that the disruption caused by Bloom and Cohen in their efforts to solicit other employees so as to improve working conditions was a primary factor in their discharge. Finally, company partner Walter Wohlgemuth admitted that he instructed Giardina not to fire Cohen until Giardina was assured that Cohen was involved in encouraging others to "document" complaints. See NLRB v. Globe Products Corp., 322 F.2d 694, 696 (4th Cir.1963) (admissions virtually conclusive of unlawful motive).
 
 
 24
 Petitioner's argument that Bloom and Cohen were discharged for alleged racially offensive conduct is unpersuasive. As petitioner asserts, Bloom stated that the only way to get ahead in the department was to be black or Puerto Rican, that Thelma Witherspoon, another proofreader, spoke funny and that she had gotten further in life than she deserved because she was black. Cohen also allegedly mocked Witherspoon. There was company testimony that the alleged racial remarks played a role in the discharge decisions. These alleged racial slurs, however, were not mentioned at the time of the discharges as a reason for the discharges. In neither memorandum prepared by Giardina during the time of Bloom's discharge did she mention the alleged racial remarks as having a role in her discharge decision.
 
 
 25
 Substantial evidence supports the Board's findings that both the rules adopted by petitioner and the discharges of employees Bloom and Cohen were in contravention of the Act. The order of the National Labor Relations Board is therefore
 
 
 26
 ENFORCED.