**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS

### FOR THE FOURTH CIRCUIT

UNION CARBIDE CORPORATION,
                    *Petitioner,*

v.                                                      No. 00-1956

NATIONAL LABOR RELATIONS BOARD,
                    *Respondent.*

NATIONAL LABOR RELATIONS BOARD,
                    *Petitioner,*

v.                                                      No. 00-2135

UNION CARBIDE CORPORATION,
                    *Respondent.*

On Petition for Review and Cross-Application for
Enforcement of an Order of the
National Labor Relations Board.
(9-CA-36332)

Argued: September 25, 2001

Decided: December 14, 2001

Before LUTTIG, WILLIAMS, and GREGORY, Circuit Judges.

Petition for review denied and cross-application for enforcement granted by unpublished opinion. Judge Gregory wrote the opinion, in which Judge Luttig and Judge Williams joined.

**COUNSEL**

**ARGUED:** Roger Allen Wolfe, JACKSON & KELLY, P.L.L.C., Charleston, West Virginia, for Union Carbide. Joan Elizabeth Hoyte, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. **ON BRIEF:** Leonard R. Page, Acting General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Frederick C. Havard, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

GREGORY, Circuit Judge:

Union Carbide Corporation ("the Company" or "Union Carbide") challenges the National Labor Relation Board's decision that it violated § 8(a)(1) of the National Labor Relations act by terminating a newly-hired employee, Rex King, for engaging in concerted activity. Upon the parties' cross-petitions, we deny Union Carbide's petition for review and grant the Board's cross-application for enforcement.

I.

King worked for Union Carbide from 1973 until 1994, when he was laid off by the Company. Union Carbide re-hired King on June 29, 1998 as a mechanic in the maintenance department, representing Union Carbide's first hiring in more than 10 years at its Charleston, West Virginia plant.

On his first day back at Union Carbide, June 29, a Union Carbide administrator explained to King the benefits to which he was entitled. The administrator explained that he would not receive a vacation for

six months, but was entitled to holidays during his 120-day probationary period.[1]

On July 21, King learned that he had a "continuous service date" of July 31, 1977. A continuous service date, or "CSD," is a date determined by Union Carbide that affects various employee benefits, including an employee's entitlement to retirement and vacation benefits. Additionally, the collective bargaining agreement ("the Agreement") in effect mandated that employees receive a paid CSD holiday every year. J.A. 337, pp. 29-30, Article 11.1. Employees who worked on their CSD would be paid at double-time-and-a-half.

Upon learning on July 21 that his CSD was July 31, King initiated several conversations to determine whether, as a new employee, he could take July 31 as a CSD holiday. Because Union Carbide had not hired anyone in almost 10 years, the issue was relatively new to the Company and, apparently, not easily resolved. First, King asked Derrick Peaks about his entitlement to a CSD holiday. Although Mickey Garnes, who was Union Carbide's General Maintenance Supervisor, was King's supervisor, Peaks filled in for Garnes while Garnes took vacation. Peaks did not know the answer to King's question, so he spoke with Carla Abshire of Union Carbide's Human Resources department. Abshire told Peaks that she would investigate the matter.

Second, once Garnes returned from vacation, King asked him about King's entitlement to a CSD holiday. Like Peaks, Garnes called Abshire, who told Garnes that she already was investigating the matter.

Third, King called Abshire several times before July 31 to discuss the matter. She could not provide a definitive answer, stating that she still was investigating the matter. Thus, without a definitive answer, King worked on July 31.

Fourth, on August 3, King asked Danny Lawrence whether he was entitled to a CSD holiday. Lawrence was King's new supervisor after Union Carbide assigned King to a project in another area of the facil-

---

[1]According to the collective bargaining agreement in effect, all new Union Carbide employees were placed on a 120-day probationary period.

ity. Like Garnes and Peaks, Lawrence called Abshire, who told Lawrence that she was investigating the matter. Additionally, Lawrence told King to "lay off this. Everyone in the Plant knows about it. Don't make no more trouble until you get a hundred and twenty days in."

Finally, once Union Carbide transferred King back to Garnes on August 17, King told Garnes that the CSD issue had "gotten blown out of proportion" and that he wanted the matter to settle down. Garnes replied that King's frequent questioning caused the matter to be blown out of proportion and that King should have just "let the system work." When Garnes accused King of raising the CSD issue with Lawrence immediately upon his transfer, despite knowing that Garnes already asked Abshire to investigate the matter, King called Lawrence a "fucking liar."

Jeff Means, the Maintenance Superintendent, fired King on August 28. Means testified that he fired King for two reasons: (1) the purportedly disruptive manner in which King pursued the CSD issue, and (2) King's attitude toward safety issues and overtime. As to the second proffered reason, Union Carbide specifically points to three warnings King received during his first two weeks of employment about his failure to wear safety glasses when required. Additionally, King purportedly complained about Union Carbide's overtime policy, stating that he "might be stuck out there every night."[2]

Means also pointed to an earlier conversation King had with Garnes as proof of King's poor attitude. Before even beginning his new job with Union Carbide, King complained to Garnes about the Company's purportedly low pay scale. When Garnes told King that Union Carbide would not raise his pay scale, King complained that Union Carbide was already "fucking" him. Garnes relayed this conversation to Means, who then sought to retract Union Carbide's offer of employment to King. Means changed his mind, though, upon the advice of Union Carbide's Human Resources department.

In March 1999, Union Carbide decided that it should have allowed King to take July 31, 1998 as a CSD holiday or paid him double-time-

---

[2]Nonetheless, King filled out overtime request forms.

and-a-half for working that day. Thus, it sent him a check covering the unpaid amount.

Upon the institution of this action, an ALJ held that Union Carbide committed an unfair labor practice by firing King. The Board adopted the ALJ's findings after receiving Union Carbide's exceptions. The Board rejected Union Carbide's contentions that King was not engaging in concerted activity and that, even if he was, the manner in which he engaged in that activity stripped him of the protections of the National Labor Relations Act ("NLRA"). The Board applied for enforcement of its order and Union Carbide petitioned for review.

## II.

### A.

We must affirm the Board's factual findings if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *see also Medeco Sec. Locks, Inc. v. NLRB*, 142 F.3d 733, 742 (4th Cir. 1998); *Fieldcrest Cannon, Inc. v. NLRB*, 97 F.3d 65, 69-70 (4th Cir. 1996). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Alpo Petfoods, Inc. v. NLRB*, 126 F.3d 246, 250 (4th Cir. 1997) (internal quotation omitted). If such evidence exists, we must uphold the Board's decision "even though we might have reached a different result had we heard the evidence in the first instance." *Id.* at 250 (internal quotation omitted). Moreover, we affirm the Board's interpretations of the NLRA if they are "rational and consistent" with the NLRA. *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 787 (1990).

### B.

Section 7 (29 U.S.C. § 157) of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." Section 8(a)(1) (29 U.S.C. § 158(a)(1)) makes it unlawful for an employer "to interfere with, restrain, or coerce employees in the exercise of the

rights guaranteed in section 7." An employer violates Section 8(a)(1) if it terminates an employee for engaging in "concerted activity." *NLRB v. City Disposal Systems, Inc.*, 465 U.S. 822, 833 n. 10 (1984); *NLRB v. Waco Insulation, Inc.*, 567 F.2d 596, 599-601 (4th Cir. 1977).

To establish a *prima facie* case of unlawful termination based on concerted activity, the NLRB General Counsel bears the burden of proving by a preponderance of the evidence "(1) that the employee was engaged in protected activity, (2) that the employer was aware of the activity, and (3) that the activity was a substantial or motivating reason for the employer's action." *Medeco*, 142 F.3d at 742. An employer successfully may rebut the General Counsel's *prima facie* case with evidence that the employer "'nonetheless would have taken the same employment action for legitimate reasons.'" *Id.* (quoting *Ultrasystems Western Constructors, Inc. v. NLRB*, 18 F.3d 251, 257 (4th Cir. 1994)). However, if the employer's proffered legitimate reasons are "non-existent or pretextual," the employer's defense will fail. *USF Red Star, Inc. v. NLRB*, 230 F.3d 102, 106 (4th Cir. 2000).

It is important to note that the NLRA "does not require that an employer cease its legitimate business practices or suspend its proper disciplinary prerogatives." *Consolidated Diesel Co. v. NLRB*, 263 F.3d 345, 352 (4th Cir. 2001). Rather, "[w]e must balance the employees' protected right against any substantial and legitimate business justification that the employer may give for the infringement." *Id.* (quoting *Medeco*, 142 F.3d at 745). "[I]t is only when the interference with § 7 rights outweighs the business justification for the employer's action that § 8(a)(1) is violated." *Id.* While there is some "leeway for impulsive behavior," an employee's concerted activity loses the NLRA's protection if the conduct is "flagrant," *Dries & Krump Co. v. NLRB*, 544 F.2d 320, 329 (5th Cir. 1976), or "so egregious that it exceed[s] the scope of whatever protection it might otherwise have been entitled to under the Act." *Caterpillar Tractor Co.*, 276 NLRB 1323, 1326 (1985) ("concerted activity loses its protection under the Act when actions are malicious, defamatory, or insubordinate"). *See also City Disposal*, 465 U.S. at 837 ("The fact that an activity is concerted, however, does not necessarily mean that an employee can engage in the activity with impunity. An employee may engage in concerted activity in such an abusive manner that he

loses the protection of § 7"). Thus, the employer's interest "in operating his business in a particular manner" must be weighed against the employee's right to engage in concerted activity. *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 227-29 (1963); *NLRB v. Lester Brothers, Inc.*, 337 F.2d 706, 708 (4th Cir. 1964).

### III.

The Board held that (1) King engaged in concerted activity by inquiring into whether he was entitled to a CSD holiday; (2) Union Carbide knew that the CSD holiday was covered by the Agreement; and (3) King's concerted activity was a substantial or motivating reason in Union Carbide's decision to terminate him. On appeal, Union Carbide challenges these findings on two grounds: (1) that King did not engage in concerted activity, and (2) that, even if King engaged in concerted activity, King's conduct in pursuing the activity was so egregious that it took him outside the scope of § 7. We reject both arguments.

### A.

In support of its first argument, Union Carbide argues that King merely asked about his CSD in general, rather than about his entitlement to a CSD holiday. This difference is critical, according to Union Carbide, because a CSD is established by corporate policy, not by the Agreement. Thus, any inquiries relating to the CSD could not be considered concerted activity. In support, CSD points to Article 15.1(C) of the Agreement, which defines a CSD as "Company service time utilized for benefits purposes as defined by [Union Carbide] Corporate Policy[.]" J.A. 337, page 42, Article 15.1(C).

However, the task of determining whether an activity is concerted and protected lies with the Board in the first instance because the task "implicated [the Board']s expertise in labor relations." *City Disposal*, 465 U.S. at 829. Thus, we give considerable deference to the Board's finding that an employee engaged in such activity. *Id.*; *NLRB v. Local Union No. 103 Int'l Ass'n of Iron Workers*, 434 U.S. 335, 350 (1978). Substantial evidence exists to support the Board's conclusion that King did more than merely inquire about his CSD in general; King's queries focused on whether he was entitled to a CSD holiday on July

31. King's inquiries to Peaks, Garnes, and Lawrence all centered on that point.

Moreover, there can be no dispute that the Agreement, rather than Union Carbide corporate policy, provided King with the entitlement to a CSD holiday. Article 11.1 of the Agreement states that "[t]he following are recognized holidays: . . . Company Service Date." J.A. 337, page 30, Article 11.1(A). Accordingly, substantial evidence supports the Board's decision that King's conduct constituted concerted activity.

### B.

Next, Union Carbide claims that the manner in which King pursued his concerted activity places him outside the scope of § 7. Union Carbide explains that,

> [d]uring the course of events, King requested [that] no fewer than three managers check into his CSD. Furthermore, he himself called Carla Abshire, . . . three or four different times to check on his CSD. Indeed, when all was said and done, there were three Human Resources Liaisons and one division head involved in the issue of King's CSD. King simply refused to cease agitating and let the system work. Moreover, King twice lied about who he had approached about the CSD issue and even called a supervisor a "fucking liar." King had been repeatedly counseled by management that he needed to pursue the CSD issue through the proper channels, so as to avoid unnecessary disruption to productivity, yet he persisted in disregarding that instruction.

Appellant's Br. at 27 (internal citations omitted).

As explained above, an employee can lose the protections of § 7 if the manner in which he engages in concerted activity is flagrant, egregious, or abusive. The Board held that King's conduct did not rise to that level because "there is no question in this case . . . that Mr. King performed his job in a very satisfactory if not an outstanding manner" and King's language was "not language sufficient to remove him or his conduct from the protections of the Act."

Neither King's conduct nor choice of language rises to the level of being flagrant, egregious, or abusive. King reportedly used foul language only once while in the employ of Union Carbide. While King's choice of words on that occasion may have been poor, "an employee's use of obscenity [is] protected where it constituted a spontaneous outburst during the heat of a formal grievance proceeding or contract negotiations, or was provoked by an employer's unfair labor practice." *Caterpillar*, 276 NLRB at 1326. King's offensive remark occurred during a conversation with Garnes about his CSD holiday. *See also NLRB v. Waco Insulation, Inc.*, 567 F.2d 596 (4th Cir. 1977). Additionally, King's repeated attempts to determine whether he was entitled to a CSD holiday were not so flagrant or egregious as to leave him unprotected. King merely pursued, albeit aggressively, his right to a CSD holiday at a time during which Union Carbide failed to provide him with a determinative answer.

## IV.

For the foregoing reasons, we deny Union Carbide's petition for review and grant the Board's cross-application for enforcement of its order.

*PETITION FOR REVIEW DENIED, AND CROSS-APPLICATION FOR ENFORCEMENT GRANTED*