**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ALPO PETFOODS, INCORPORATED;
FRISKIES PETCARE, a Division of the
Nestle Food Company,
<u>Petitioners,</u>

v.                                                                      No. 96-1572

NATIONAL LABOR RELATIONS BOARD;
OIL, CHEMICAL & ATOMIC WORKERS
INTERNATIONAL UNION,
<u>Respondents.</u>

NATIONAL LABOR RELATIONS BOARD,
<u>Petitioners,</u>

v.
                                                                        No. 96-1604

ALPO PETFOODS, INCORPORATED;
FRISKIES PETCARE, a Division of the
Nestle Food Company,
<u>Respondents.</u>

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board.
(6-CA-26669)

Argued: March 5, 1997

Decided: September 11, 1997

Before HALL and ERVIN, Circuit Judges, and MICHAEL,
Senior United States District Judge for the
Western District of Virginia, sitting by designation.

_____

Petition denied and enforcement granted by published opinion. Judge Ervin wrote the opinion, in which Judge Hall and Senior Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** Steven Robert Wall, MORGAN, LEWIS & BOCKIUS, L.L.P., Philadelphia, Pennsylvania, for Petitioners. Jill Ann Griffin, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. **ON BRIEF:** Barry E. Gosin, MORGAN, LEWIS & BOCKIUS, L.L.P., Philadelphia, Pennsylvania, for Petitioners. Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Paul J. Spielberg, Deputy Assistant General Counsel, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent.

_____

**OPINION**

ERVIN, Circuit Judge:

Petitioner/Cross-Respondent Alpo Pet Foods, Inc. (Alpo) petitions for review of a decision and order of the National Labor Relations Board (Board), Respondent/Cross-Petitioner here, finding that Alpo had violated the National Labor Relations Act when it laid off three employees following a unionization campaign. The Board seeks enforcement of its order requiring, inter alia , reinstatement with back pay and restoration of seniority rights for these three employees. We deny Alpo's petition for review and grant the Board's cross-application for enforcement of its order.

I.

Alpo operates a pet food can parts facility in Weirton, West Virginia. This facility, which opened in 1985 with four initial employees, has been managed by Vincent Kirpsak since its inception. Following its 1987 decision to expand into the cat food market, Alpo decided in 1989 to expand the capacity at the facility to manufacture containers

2

in-house. As part of this effort, the maintenance department's staffing was increased from four to eight employees in 1990, and, by design, as much of the plant expansion as possible was to be undertaken by these employees. By 1993, the expansion program was essentially complete, with only minor work to be done through 1994. Maintenance outsourcing decreased each year from 1991 onwards.

In November 1993, Kirpsak's supervisor advised him that the Weirton facility was facing a forecasted shortfall of $382,000 for the fiscal year ending September 30, 1994. Kirpsak responded with an action plan to cut costs by $373,000, including shutting down the plant for three five-day periods, saving energy, selling production time to outside companies, and tweaking the volume/mix in the production process.

Later that same month, David Gamble, an employee in the maintenance department, began attempts at organizing the 75 employees at the facility. To varying degrees he was joined in his efforts by his fellow maintenance department employees Charles Artman, Mark Hager, and Earl Franklin Speerhas. Ultimately the campaign proved unsuccessful, and the Oil, Chemical and Atomic Workers International Union (Union) lost the February 18, 1994 election by a vote of 50 to 25. The Union filed neither unfair labor practice charges nor objections at that time for any conduct during the campaign, and the Board certified the results on February 28. Alpo had conducted its own anti-unionization campaign at an estimated cost to the plant of $50,000.

By April 1994, it became clear to Kirpsak that his cost-savings plan could not be implemented and by June he thought it was necessary to act on the situation. Kirpsak therefore proposed to his supervisor on June 28 that three maintenance department positions be eliminated, justifying the reorganization in large part on the fact that the capital expansion project was nearly complete and that it made sense to return the maintenance department staffing to its pre-expansion project level. Kirpsak determined that proper operation of the facility required the retention of a plant electrician, two tool and die workers, and one machinist, with the consequence that the positions of machinist/electrician and two machinists would be eliminated. As a result of these permanent layoffs, Kirpsak recognized that additional outsourc-

3

ing would be necessary and that certain retained employees would have to take on greater responsibilities, thus warranting a $0.20/hour wage increase. Nevertheless, the net effect of the layoffs would be a savings of more than $84,000.

Kirpsak claimed that he subsequently turned to the employee handbook to implement the seniority procedures to determine which employees would be laid off. On July 11, 1994, Gamble, Hager, and Speerhas were notified that they were being permanently laid off from the maintenance department. Hager, however, with the most plant-wide seniority of these three employees, was offered an entry level job as a packer, which he accepted.

On September 6, 1994, the Union filed a charge alleging that Alpo had violated Section 8(a)(1) and (3) of the National Labor Relations Act (NLRA or Act), 29 U.S.C. § 158(a)(1), (3), by laying off Gamble, Hager, and Speerhas in retaliation for their union activities. Following a two-day hearing before an administrative law judge (ALJ), the ALJ issued a decision finding the company had violated the Act. The Board, in a March 20, 1996 decision and order, affirmed the ALJ's findings and conclusions in toto and adopted his recommended order with only a minor modification. See Alpo Pet Foods, Inc., 320 N.L.R.B. 956, 320 N.L.R.B. No. 101 (Mar. 20, 1996).

The ALJ credited Kirpsak's reasons as to why certain positions were retained but found "patently untrue" Kirpsak's testimony that he considered only the positions, and not the individuals, to be eliminated, especially in Gamble's case. See id., slip op. at 17. Indeed, because the ALJ saw this testimony as an attempt to mislead him and the Board, he drew the adverse inference that the true motivation behind Gamble's layoff was unlawful. See id., slip op. at 18. The ALJ also found that Gamble had been threatened by the human resources manager, a § 8(a)(1) violation, and intimidated by Kirpsak during the election campaign. See id. More generally, Alpo's turn to certain outsourcing, a decrease in machine efficiency after the layoffs, and the $0.20/hour raise evidenced to the ALJ that Alpo's failure to admit its economic mistake was unlawfully motivated and that it was not in such dire financial condition as to have made the layoffs economically necessary. See id., slip op. at 19. The ALJ concluded that the layoffs of Gamble, Hager, and Speerhas and the subsequent subcon-

4

tracting of the work previously performed by them, to avoid recalling them, was a violation of § 8(a)(1) and (3) of the Act. See id. In addition, because Alpo had failed to demonstrate to the ALJ's satisfaction that the layoffs would have occurred in the absence of the protected union activities, Alpo failed to meet its burden under Wright Line, Inc., 251 N.L.R.B. 1083 (1980), enforced on other grounds, 662 F.2d 899 (1st Cir. 1981), cert. denied, 455 U.S. 989 (1982). See id., slip op. at 20. As a result of this decision, the Board ordered Alpo to, inter alia, reinstate Gamble, Hager, and Speerhas to their former positions with back pay and restored seniority rights.

Alpo petitions for review of the Board's decision and order. The Board cross-petitions for enforcement of its order.

II.

The Board possessed subject matter jurisdiction below pursuant to 29 U.S.C. § 160(a). The Board's Decision and Order of March 20, 1996, constitutes a final order under the NLRA, and thus we possess appellate jurisdiction pursuant to 29 U.S.C. § 160(e), (f).

The Board's decision is to be upheld if its factual findings are supported by substantial evidence on the record. 29 U.S.C. § 160(e). This is so "even though we might have reached a different result had we heard the evidence in the first instance." NLRB v. General Wood Preserving Co., 905 F.2d 803, 810 (4th Cir.) (internal quotation marks and citations omitted), cert. denied, 498 U.S. 1016 (1990). "Substantial evidence has been held to mean `such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting NLRB v. Aquabrom, Div. of Great Lakes Chem. Corp., 855 F.2d 1174, 1178 (6th Cir. 1988)).

III.

A.

Discriminatory discharge is an unfair labor practice under § 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3).[1] An employer's actions violate this
_____
**1** Section 8(a)(3) of the Act provides in pertinent part:

It shall be an unfair labor practice for an employer. . . by dis-

5

section, however, only if they are motivated by anti-union animus. Goldtex, Inc. v. NLRB, 14 F.3d 1008, 1011 (4th Cir. 1994). We have recently laid out the standards with which to deal with such cases:

> The Board has established a formula for determining when an allegedly discriminatory discharge violates the [Act]. First, the General Counsel must make out a prima facie case that the employer's decision to lay off an employee was motivated by anti-union animus. The burden then shifts to the employer to prove affirmatively that the same action would have been taken even in the absence of the employee's union activity. To make out a prima facie case, the General Counsel must show (1) that the employee was engaged in protected activity, (2) that the employer was aware of the activity, and (3) that the activity was a substantial or motivating reason for the employer's action. Motive may be demonstrated by circumstantial as well as direct evidence and is a factual issue which the expertise of the Board is peculiarly suited to determine.

FPC Holdings, Inc., v. NLRB, 64 F.3d 935, 942 (4th Cir. 1995) (citations and internal quotations marks omitted).

The issue in this case, then, is whether substantial evidence on the whole record can sustain the Board's conclusion that the layoffs of Gamble, Hager, and Speerhas were partly or wholly motivated by the purpose of discouraging union activities at Alpo. See NLRB v. Instrument Corp. of America, 714 F.2d 324, 328 (4th Cir. 1983). Although the Board's determination of motive will not be overturned if it is reasonable, "mere speculation as to the [employer's] real motives registers no weight on the substantial evidence scale." Id. (internal quotation marks and citations omitted). Alpo, of course, can attempt to rebut the prima facie case, once established, by presenting a valid

_____

> crimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. . . .

29 U.S.C. § 158(a)(3).

6

business justification. Goldtex, 14 F.3d at 1013; NLRB v. Nueva Eng'g, Inc., 761 F.2d 961, 967 (4th Cir. 1985).

In this case, there is no question that Gamble, Hager, and Speerhas were engaged in protected activities and that Alpo was aware of these activities, at least by the time of layoff in each instance, if not before. The case turns, then, on Alpo's motivation for the layoffs. Although there is direct evidence of Alpo's motive with respect to Gamble, the Board's evidence as it pertains specifically to Hager and Speerhas is entirely circumstantial. Moreover, that specific circumstantial evidence is very closely tied with Alpo's business justification. Thus, although normally the burden does not shift to the employer to show its business justification until after the prima facie case of motive has been made, Goldtex, 14 F.3d at 1011, in this case it is necessary to consider the factual evidence for both in tandem.

B.

We deal first with the circumstantial evidence relating to Alpo's motives and justification in laying off Hager and Speerhas, considered separately from Gamble. In particular, the Board, adopting the ALJ's conclusions, determined that Alpo failed to sustain its rebuttal burden because the "decrease in machine efficiency suffered as a direct result of the discriminatory layoffs demonstrably precludes the availability . . . of a Wright Line defense." Alpo Pet Foods, slip op. at 20. Substantial evidence does not support the conclusion that machine efficiency decreased materially after the layoffs, and the analysis relied upon is critically flawed. First, the Board treated July 1994 as a month following the layoffs when the layoffs occurred in mid-July; July 1994 should properly have been excluded altogether. Second, the Board ignores the fact that, since the hearing was held before the ALJ in March 1995, efficiency data existed only through February 1995; therefore, it was impossible to consider a full year of both pre- and post-layoff data. This is important because, third, the Board also ignored the cyclical nature of the facility's production during the course of a year; moreover, the Board did not control for differences in production requirements from year to year which could greatly affect efficiency. Fourth, the Board, either on its own or through the General Counsel, failed to perform a proper statistical analysis, engaging in no more than simple facial comparisons and raw averag-

ing. Frankly, the Board's analysis, see id., slip op. at 15-17, in which it invests so much weight in its conclusion, is meaningless. Even a cursory examination of the efficiency data, see J.A. at 487-95, shows that overall efficiency appeared to remain about the same and that any decrease was not statistically material.[2] The Board's conclusion that Alpo's "own charts prove that the layoffs were injurious," but that Alpo refuses to admit they were an economic mistake for fear of showing its unlawful motivation, Alpo Pet Foods, slip op. at 19, is pure speculation, due zero weight on the substantial evidence scale. See Instrument Corp., 714 F.2d at 328. Instead, the lack of material change in machine efficiency shows that Alpo is doing pretty well without these three employees and that their layoffs may, indeed, have been a wise economic move.

An examination of the other principal circumstantial evidence of the economic effects of the layoffs shows it to be on similarly weak ground. For instance, the Board noted that one of the retained mainte-nance department employees testified that work has not backed up

_____

[2] It is not our province to perform the statistical analysis that the Board should have undertaken. Nevertheless, a simple comparison of the seven-month period following the layoffs, August 1994-February 1995 (all the data available), with the same seven month period in the comparable ear-lier period reveals the following:

| Machine Group | Aug. 93-Feb. 94 (before layoffs) | Aug. 94-Feb. 95 (after layoffs) |
|---|---|---|
| 300 DIA END | 84.0% | 83.7% |
| 307 DIA END | 82.4 | 78.1 |
| 307 EZO END | 56.4 | 58.6 |
| Shearing | 76.9 | 79.7 |
| Decorating | 75.1 | 72.6 |

In other words, there was a decrease in two groups (307 DIA END and Decorating), an increase in two groups (307 EZO END and Shearing), and one group with no material change (300 DIA END). Although prob-ably meaningless statistically, the average efficiency over all the groups was 74.96% before the layoffs and 74.54% after the layoffs, representing no material change. At least this simple comparison compares apples with apples, unlike the Board's which fails to consider relevantly compa-rable periods.

8

sufficiently to necessitate Hager's transfer back to maintenance. See Alpo Pet Foods, slip op. at 14. However, because that same employee also testified that on one occasion in the seven months since the lay-offs he came in to work and found one production line down and that he had to repair it so that the operators could run it, the Board concluded that the layoffs left Alpo "with a shortage of personnel but that it has chosen to suffer the shortage rather than recall them." Id., slip op. at 14-15. This is nonsense. No reasonable mind would accept one instance of the breakdown of complicated machinery over a seven month period as adequate to support the conclusion that Alpo would rather suffer a personnel shortage than recall these laid-off employees. See NLRB v. General Wood Preserving Co., 905 F.2d 803, 810 (4th Cir.) (stating that "[s]ubstantial evidence has been held to mean `such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" (quoting NLRB v. Aquabrom, Div. of Great Lakes Chem. Corp., 855 F.2d 1174, 1178 (6th Cir. 1988)), cert. denied, 498 U.S. 1016 (1990). This conclusion is bolstered by the Board's own conclusion that the amount of overtime assigned to the retained employees to do the work ordinarily performed by the laid-off employees was "minimal." Alpo Pet Foods, slip op. at 14.

Finally, in this same vein, the Board concluded that there was an increase in the amount of subcontracting of work that previously would have been done by the laid-off employees and that this subcontracting was specifically part of the violation of the Act. See id., slip op. at 19. While it is probably true that the general decrease in sub-contracting was due to the winding down of the expansion project and thus does not vitiate this specific increase in subcontracting, the increase amounted to only $4900 over seven months (about $7500 annualized) that could be directly attributed to the absence of the laid-off employees. Kirpsak had originally estimated that the facility would have to outsource about $15,000 worth of work as part of the cost of the reorganization and layoffs. Thus the layoffs resulted in even less of an economic cost than originally thought, and consequently the net benefit of the reorganization was even greater. The cost savings, estimated at about $84,000, now appear to be more than $90,000. It is hard to believe, looking only at this evidence, that a company was illegally motivated not to retain three employees, and thus incur outsourcing costs of $4900, when their layoff would provide a net benefit of $90,000. Substantial evidence does not support

9

the Board's implicit conclusion that Alpo was motivated to be rid of these employees, outsourcing costs be damned.

In sum, we conclude that the Board's circumstantial evidence, standing alone, is not substantial enough to support its conclusion that Hager and Speerhas's layoffs were unlawfully motivated. Were this circumstantial evidence the only evidence the Board presented to support its ruling that Hager and Speerhas's layoffs were violations of the Act, then we would conclude that the Board would have failed to carry its burden of establishing a prima facie case. However, because we determine in the next subsection, part III.C., infra, that Alpo was motivated by anti-union animus in its layoff of Gamble, we examine the import of that animus with respect to Hager and Speerhas in part IV, infra.

C.

The Board presents additional and much stronger direct evidence of unlawful motivation in the case of Gamble.[3]

As an initial matter, two pieces of such evidence that the Board relies on must be discounted. At a captive audience meeting just before the election, Kirpsak came near to Gamble and, looking down over his glasses, said "We don't need a union here." Alpo Pet Foods, slip op. at 12. However, an employer's speech that does not threaten reprisal or force, or promise a benefit, in relation to union activities is unqualifiedly privileged under the Act. See NLRB v. Threads, Inc., 308 F.2d 1, 9 (4th Cir. 1962); see also 29 U.S.C. § 158(c). An employer's lawful anti-union speech may not be chilled by the return threat that the Board may use it as evidence of unlawful motivation. See Holo-Krome Co. v. NLRB, 907 F.2d 1343, 1346-47 (2d Cir. 1990). This episode may therefore play no part in the Board's prima facie case on Alpo's motivation. For the same reasons, Alpo's pro-

_____

[3] All of the circumstantial evidence discussed above, see supra part III.B., in the context of Hager and Speerhas's layoffs, was also adduced as evidence in Gamble's layoff. We reject that circumstantial evidence in Gamble's case for the same reasons. We have merely bifurcated our approach to all of the evidence in the record to demonstrate where the Board's decision is sustainable and where it is not.

10

duction manager's statement, at the initial captive audience meeting, that the organizing effort was like a knife in his back must be discounted.

Nevertheless, four other episodes do convincingly support the conclusion that substantial evidence underlies the finding that Alpo was unlawfully motivated in its layoff of Gamble. First, at one point Alpo's human resources manager told Gamble, "We know that you are a union leader because we have six people that have seen you hand out union petitions." He then added, "You know, this could be a very big financial burden on your family." Alpo Pet Foods, slip op. at 11. The Board properly concluded that this was a threat of termination that would have been a separate § 8(a)(1) violation had it been alleged in a timely fashion and thus very probative evidence. See id., slip op. at 18.

Second, there is substantial, indeed compelling, evidence that Alpo's human resources manager repeatedly surveilled Gamble's, and other employees', union activities. See id., slip op. at 10-12. We have previously held that "[i]t is an unfair labor practice for an employer to create in the minds of employees an impression that he is closely observing union organizational activity." J.P. Stevens & Co. v. NLRB, 638 F.2d 676, 683 (4th Cir. 1980); see also Nueva Eng'g, 761 F.2d at 967. Again, although the surveillance was not timely alleged as a violation, it remains forceful evidence of unlawful motive. See Alpo Pet Foods, slip op. at 18.

Third, in May 1994, just before Kirpsak's decision to formulate a reorganization plan, Gamble had placed a newspaper ad supporting the unionization efforts of the employees at the company that shared the same complex with Alpo. Although there is no direct evidence that Alpo knew that Gamble had placed the ad, substantial evidence supports the conclusion that "it had to have been clear to [Alpo's] management that Gamble must have been involved and that he was going to remain an active unionist for as long as he was around." Id., slip op. at 19. Gamble was the leader of unionization efforts at Alpo and made it no secret to his fellow employees that he intended to place the ad in support of his compatriots. See id., slip op. at 13. The close temporal connection between this incident and the plan resulting

11

in Gamble's layoff strongly supports the inference that Alpo was unlawfully motivated.

Finally, Kirpsak testified that his reorganization plan was formulated on the basis of positions and not individuals:

> [W]hen we got approval to proceed with this, we went to the policy manual and read it, and read it. And thought about it until we came up with exactly how we were going to proceed with what particular individual.
>
> Prior to that, it was just jobs. There were no individuals. At this point, when the memo was written, it was jobs. It was not individuals.

Id., slip op. at 18. The Board found this testimony to be "patently untrue," "pure nonsense," and a deliberate attempt to mislead it. Id., slip op. at 17-18. Substantial evidence plainly supports this finding. Kirpsak was the general manager of a facility with 75 employees and had been such since its inception. It is unimaginable that, when Kirpsak proposed to eliminate the plant's sole position of machinist/electrician, he didn't know that Gamble was that sole machinist/electrician.[4] The Board properly concluded that Kirpsak's denial that Gamble was scheduled for layoff all along warrants the adverse inference that Alpo's true motivation behind the layoff was unlawful. See id., slip op. at 18.

We note that any one of these episodes alone is probably sufficient for the Board to establish its prima facie case of unlawful motivation. Considered together there can be no question but that the Board sustained its burden in the case of Gamble. The issue becomes, then, whether Alpo's proffer of a business justification sustains its shifted burden under Wright Line. See, e.g., Goldtex, 14 F.3d at 1013.

A number of facts weigh in Alpo's favor. First, the staffing of the maintenance department was initially increased for the expansion

_____

[4] At oral argument, Alpo's counsel essentially conceded that Kirpsak was lying and that he knew who would be laid off.

12

project. Because that project was winding down, it makes logical and economic sense to return to a pre-expansion project staffing level. Second, the return to that previous level has evidently not had a materially adverse affect on plant performance. Indeed, to the extent that the facility's machine groups are performing at materially the same level as before the layoffs with three fewer employees indicates that overall efficiency has actually increased. In fact, this increase is measurable: it is the $90,000 net benefit of laying off these three employees. Finally, Kirpsak was advised of the forecasted shortfall in the 1994 fiscal year, and directed to address it, before Gamble began the organizing activities. Thus, at least initially, Alpo's economic motives for developing an action plan were not pretextual. Although not part of Alpo's business justification, an equity further weighing in its favor is the fact that Gamble had been significantly involved in a prior organization campaign in 1990, and there is absolutely no evidence that he was retaliated against as a result.

A number of facts also significantly militate against Alpo's justification. First, there is the close temporal connection between Gamble's May 1994 newspaper ad and the imminent promulgation of a plan that would eliminate him as a further threat for unionizing the facility. This connection takes on further significance since Kirpsak was not prompted by his supervisor either to reformulate the action plan of November 1993 or to suggest reorganizing the plant.

Second, there is a substantial and significant debate between Alpo and the Board about the true economic necessity for layoffs by that time. This debate clearly distinguishes this case from Goldtex, in which it was undisputed that some layoffs were economically necessitated. See Goldtex, 14 F.3d at 1011. Kirpsak waffled in his testimony as to whether, by April 1994, the entire forecasted shortfall was $115,000 or whether just the labor component totaled that amount. Compare J.A. at 221 (stating on direct that at the beginning of June 1994 there was a $115,000 shortfall in labor costs) with J.A. at 265-67 (stating repeatedly on cross that the entire budget deficit had declined from $382,000 to $110,000-$115,000 by April) and with J.A. at 289 (restating on redirect that the $115,000 figure represented just labor costs). If Kirpsak's testimony that the $115,000 figure represented only labor costs be accepted, then there is absolutely no explanation as to how an estimated annualized $98,000 labor cost

13

shortfall near the beginning of the fiscal year had grown, six months later and with less than half the fiscal year to go, to $115,000. Further, if the economic condition of the facility had, in fact, worsened so much over those months, then a projected $84,000 salve would only have partially ameliorated that condition. Yet there is no evidence that Kirpsak even considered, let alone implemented, any other actions to bring the facility back in budget. Unlike the November 1993 action plan that considered cost savings over the whole plant, this isolated action, if severe deficits remained elsewhere, could have caused more harm than good and is not characteristic of a thoughtful manager. All of this is to say that Kirpsak's credibility on the issue of economic necessity for the layoffs is sorely lacking. Like the fabrication of his story concerning the June 1994 proposal for downsizing, Kirpsak's reasons for all of his actions appear pretextual.

Third, Kirpsak admitted that Alpo's anti-unionization campaign cost his plant alone $50,000. Substantial evidence supports the Board's finding that "Kirpsak was fully aware that Gamble was the person responsible for the organizational campaign, the ringleader, the individual who cost the Company $50,000. He was special, not just one of several moderately prounion people . . .." Alpo Pet Foods, slip op. at 18. Finally, Alpo had bragged in its campaign literature, including in letters sent to each employee, that it had never laid off anyone permanently in the entire time the facility had been open. This record stands in marked contrast to the subsequent laying off of three employees within five months of the election, including Gamble, the "ringleader."

Given the weaknesses in Alpo's justification for the discharges, we conclude that Alpo has not sufficiently shown that its proffered reasons are not pretextual, see Nueva Eng'g, 761 F.2d at 968-69, and that therefore it has not rebutted the strong evidence of unlawful motivation that the Board established with respect to Gamble. Substantial evidence supports the Board's finding that Alpo, determined to rid itself of the ringleader, was willing to sacrifice Hager and Speerhas under the seniority rules to reach Gamble. We admit we are somewhat troubled by this conclusion since, in fact, both Gamble and Speerhas have been recalled to production positions, although not to their former maintenance positions, and Hager was "recalled" as a packer the day he was laid off. Still, the "substantial evidence" standard is defer-

14

ential to the Board's findings, and while we would be much less sure that the Board would or should prevail under a preponderance of the evidence standard, that is not the test. We can only conclude, then, that the Board's decision with respect to Gamble should be upheld even though we might have reached a different result had we heard the evidence in the first place. See General Wood Preserving, 905 F.2d at 810.

IV.

Having concluded that Alpo violated the Act with respect to Gamble, we must now determine whether the anti-union animus exhibited can serve to bootstrap Hager and Speerhas's layoffs into violations warranting remedial action as well. Alpo argues that our decision in Goldtex precludes this result. In Goldtex, we refused to assume that because the employer had acted with improper motivation as to one employee that it had also done so with respect to three other discharged employees. Instead, we required the Board"to show what the statute mandates: that the employees were discharged for the purpose of discouraging union activities." Goldtex , 14 F.3d at 1012. Alpo would have us read Goldtex as requiring (1) the Board to establish that each employee was laid off for the purpose of discouraging union activities and (2) us to conclude that Hager and Speerhas's layoffs do not constitute violations of the Act because the Board failed to carry its burden of showing that each was individually laid off as a result of anti-union animus directed towards him.

As noted above, see supra part III.C., the instant case is plainly distinguishable from Goldtex, for in Goldtex it was undisputed that economic circumstances necessitated layoffs by the employer. See Goldtex, 14 F.3d at 1011. We were careful there to emphasize repeatedly in our two paragraph discussion that it was the posture of economic necessity that led us to conclude that the impermissible discharge of one employee does not "automatically infect" all simultaneous discharges. See id. at 1012 ("Where, as here, layoffs were necessitated by economic circumstances, the impermissible discharge of one pro-union employee does not automatically infect all discharges made during that same month."); id. at 1012-13 (distinguishing NLRB v. Frigid Storage, Inc., 934 F.2d 506 (4th Cir. 1991), Hyatt Corp. v. NLRB, 939 F.2d 361 (6th Cir. 1991), and Ballou Brick Co.

15

v. NLRB, 798 F.2d 339 (8th Cir. 1986), on the ground that the layoffs in those cases were not economically necessary); id. at 1013 ("It is not disputed that the layoffs in this case were required because of a downturn in Goldtex's business fortunes . . . ."); id. ("Where layoffs are economically justified, the invalidation of a single impermissible discharge will not serve to similarly invalidate all contemporaneous terminations.").

Instead, here we are faced with the posture where substantial evidence supports the Board's conclusion that Alpo was willing to sacrifice Hager and Speerhas under the seniority rules in order to get rid of Gamble. Although there are few cases directly on point, it is well-settled that, in the context of mass layoffs,[5] § 8(a)(3) violations may be sustained where an employer orders the layoffs"for the purpose of discouraging union activity or in retaliation against its employees because of the union activities of some." Birch Run Welding & Fabricating, Inc. v. NLRB, 761 F.2d 1175, 1180 (6th Cir. 1985). See also Hyatt Corp., 939 F.2d at 375-76 (upholding § 8(a)(3) violations, under Birch Run's general layoff theory, where three union supporters and nine other employees were discharged over a seven month period); Merchants Truck Line, Inc. v. NLRB, 577 F.2d 1011, 1016 (5th Cir. 1978) ("Where the central aim of a mass lay-off is to discourage union activity, the discharge is unlawful, even though neutral or anti-union employees suffer in the process."); Majestic Molded Prods., Inc. v. NLRB, 330 F.2d 603, 606 (2d Cir. 1964) ("A power display in the form of a mass lay-off, where it is demonstrated that a significant motive and a desired effect were to`discourage membership in any labor organization,' satisfies the requirements of § 8(a)(3) to the letter even if some white sheep suffer along with the black.").[6] In Frigid Storage, we refused to allow an employer to wield an "undiscerning axe." Frigid Storage, 934 F.2d at 510. In that case, we upheld a § 8(a)(3) violation for the discharge of an employee, whose union sentiments were unknown, when he was fired on the Monday

---

[5] We note that, although small in absolute number, the three layoffs here constituted 43% of the maintenance department.
[6] The Board itself routinely relies on this mass layoff theory. See, e.g., Rainbow News 12, 316 N.L.R.B. 52, 1995 WL 25663 at *32 (Jan. 20, 1995); ACTIV Indus., Inc., 277 N.L.R.B. 356, 1985 WL 46074 at *1 n.3 (Nov. 12, 1985).

16

following the Friday discharge of two union adherents and the manager's anti-union tirade in which he had threatened to discharge an employee on Monday. See id. (citing Birch Run, Merchants, and Majestic).

Even when the axe is wielded in accordance with seniority rules, courts enforce the Board's order as to all discharged employees, not just those whom the employer was explicitly targeting. In Tesoro Petroleum, for example, the Ninth Circuit upheld a § 8(a)(3) violation for the discharge of four employees. Three of the employees were union members, but the fourth and most junior had not revealed his union leanings. The fourth was fired to reach the three more senior. The court rejected the employer's economic justification and expressly noted that the fourth would be entitled to reinstatement and back pay along with the others. NLRB v. Tesoro Petroleum Corp., 431 F.2d 95, 96-97 (9th Cir. 1970). Similarly, in Majestic Molded Products, the Second Circuit enforced the Board's order where the layoffs were in order of seniority, without regard to whether the employer was aware of any individual's pro-union sentiment, and a significant motive of the layoffs was to discourage union membership. Majestic Molded Prods., 330 F.2d at 605-06.

In the instant case, Alpo sought to rid itself of ringleader Gamble in order to discourage future union activities. Bound by its own seniority rules, however, Alpo also had to lay off Hager and Speerhas. Unlike these other cases, Alpo knew before the layoffs that both Hager and Speerhas were union supporters. Alpo could thus kill three birds with one stone. On the whole record, then, Alpo's attack on Gamble evinced enough anti-union animus to suffice for all three. We therefore conclude that all three layoffs were unlawfully motivated and the Board's order should be enforced as to all three.

PETITION DENIED AND ENFORCEMENT GRANTED

17