FILED:  May 28, 1998

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

————————

No. 96-2803
(11-CA-16215)

————————

MEDECO SECURITY LOCKS, INCORPORATED,

Petitioner,

versus

NATIONAL LABOR RELATIONS BOARD,

Respondent.

————————

No. 97-1116

————————

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

versus

MEDECO SECURITY LOCKS, INCORPORATED,

Respondent.

————————

O R D E R

————————

The court amends its opinion filed April 29, 1998, as follows:

On page 23, first full paragraph, lines 6-8, the sentence beginning "We therefore remand" and ending "violations of § 8(a)(1)" is deleted.

The disposition on pages 2 and 23 is edited to read "Enforcement granted in part and denied in part."

The petitioner, Medeco Security Locks, Inc., is given seven days from the entry of this order to submit any further objection to the Board's proposed judgment.

Entered at the direction of Judge Michael with the concurrence of Chief Judge Wilkinson.

For the Court,

_____
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MEDECO SECURITY LOCKS,
INCORPORATED,
<u>Petitioner,</u>

v.

NATIONAL LABOR RELATIONS BOARD,
<u>Respondent.</u>

No. 96-2803

NATIONAL LABOR RELATIONS BOARD,
<u>Petitioner,</u>

v.

MEDECO SECURITY LOCKS,
INCORPORATED,
<u>Respondent.</u>

No. 97-1116

On Petition for Review and Cross-application
for Enforcement of an Order
of the National Labor Relations Board.
(11-CA-16215)

Argued: October 29, 1997

Decided: April 29, 1998

Before WILKINSON, Chief Judge, and RUSSELL* and
MICHAEL, Circuit Judges.

_____

*Judge Russell participated in the decision of this case but died before
the opinion was issued. The opinion is filed by a quorum of the panel
pursuant to 28 U.S.C. § 46(d).

Enforcement granted in part and denied in part by published opinion. Judge Michael wrote the opinion, in which Chief Judge Wilkinson joined.

---

**COUNSEL**

**ARGUED:** Clinton Stephen Morse, FLIPPIN, DENSMORE, MORSE, RUTHERFORD & JESSEE, Roanoke, Virginia, for Petitioner. Richard A. Cohen, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. **ON BRIEF:** Todd A. Leeson, FLIPPIN, DENSMORE, MORSE, RUTHERFORD & JESSEE, Roanoke, Virginia, for Petitioner. Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent.

---

**OPINION**

MICHAEL, Circuit Judge:

Medeco Security Locks, Inc. petitions this court to review a decision and order of the National Labor Relations Board, and the Board cross-petitions for enforcement of its order. The Board's decision affirmed the administrative law judge's ruling that Medeco had (1) violated § 8(a)(1) of the National Labor Relations Act by prohibiting employees from discussing certain employment matters and (2) twice violated § 8(a)(1) and § 8(a)(3), first by transferring William C. Folden to a second-shift position and second by subsequently firing Folden. We conclude that there were three independent violations of § 8(a)(1). On the other hand, we believe there was a lack of substantial evidence to support the Board's determination that anti-union animus motivated the personnel decisions affecting Folden. Accordingly, we grant the Board's cross-petition for enforcement as to § 8(a)(1) but deny enforcement as to § 8(a)(3).

I.

Medeco operates a Salem, Virginia, plant where it manufactures and distributes precision locks. In 1993 the International Union of

2

Electronic, Electrical, Salaried, Machine, and Furniture Workers, AFL-CIO (the "Union") attempted to unionize the employees at Medeco. The Union collected enough union cards to bring about an election, but on March 22, 1993, a majority of Medeco's employees voted against unionization.

After this election Medeco made several company wide changes aimed at providing its employees an alternative to unionization. Medeco's new employee handbook explained in May 1993 that "[w]e are a non-union company and we want to stay that way. We feel our union-free status is a benefit to [our employees] . . . [and] we intend to oppose unionization by every proper and legal means and by the equitable treatment of all individuals." Medeco began initiatives to emphasize team building, employee participation, and an open-door complaint policy to address employee concerns. It also hired Dennis Taggert in August 1993 as a new vice-president of human relations and promoted Diane Ward, a rank-and-file employee, to the position of human relations manager in November 1993. Ward's office was located in the center of the production floor to make her readily accessible to employees who wished to discuss or mention concerns about employment.

The next year, in January of 1994, the Union began another campaign to unionize Medeco. As expected, the company responded by mounting an aggressive anti-unionization campaign. Medeco held a series of meetings with its employees, showed anti-union films that depicted union violence, posted various signs opposing unionization, and instructed its managers to ask employees not to sign union cards. This time, perhaps because of the company's effort, the Union was not able to obtain enough cards to petition for an election.[1]

In 1994 Medeco employees William C. Folden and Louis Rickman were subject to several adverse employment actions. Folden was ulti-

_____

[1] After the events relevant to this case, the Union collected enough signatures to petition for an election in 1995. However, a majority of Medeco's employees again voted against unionization on May 15, 1995. Medeco represents that no unfair labor practice charges were filed against it with respect to either the 1993 or 1995 election. Brief in Support of Petition for Review at 26 n.15.

3

mately fired in late May, and Rickman quit in November. Medeco's treatment of these employees and the company's alleged anti-union motivations are the subject of this proceeding.

A.

William C. Folden began working for Medeco in 1976 and remained with the company until he was terminated on May 27, 1994. During the 1993 organizing effort, Folden was a highly visible and active union supporter. He attended union meetings, served as a union representative in observing the election, and was one of the more out-spoken advocates of unionization. Folden admits that he wore a pro-union cap and was not shy about his union support. Once Medeco began to change its policies after the 1993 campaign, however, Folden told his supervisor, Steve Bullock, that he was not interested in any more organizational activity with the union. Specifically, when the 1994 union drive was about to begin, Folden told Bullock that he (Folden) was "very positive about the change that was going on" at Medeco and that he "didn't feel the need for[the union] any more." In addition, human relations manager Ward testified that Folden told her that he had been active in the 1993 union effort "but that this year [1994] he wasn't, he didn't want any part of it." Folden did not have a clear recollection of this conversation.

Folden nevertheless had some participation in the 1994 union campaign. When compared to his role in the 1993 campaign, however, his involvement in 1994 was minimal. Folden first testified that he "[j]ust attended the meeting[s]." He later added that he "received some signed [union] cards" in Medeco's parking lot, but any part he played in taking cards appears to have been quite minimal. He acknowledged that these acts constituted the "extent of [his] involvement" in 1994.

By early 1994 Folden was serving, as a representative from the Quality Control Department, on a "cross-functional team" organized by Medeco. The team was composed of a cross-section of employees who met weekly with management to discuss topics of concern and interest to employees. During one of the team's meetings on February 4, 1994, the team's normal chairwoman (a manager) was absent and Norma Doudy, a non-management employee in the accounting department, stood in as her replacement. Doudy explained that she

4

would be reporting to Medeco's president about the meeting. At one point during the meeting, Doudy asked Folden how the union drive was going and whether there were enough cards for a petition. Thereafter, Folden went to Bullock and told him that he (Folden) "didn't think [a team meeting] was the proper time or place to discuss those topics." Bullock agreed and said that he would advise Doudy that her questions about the union drive were inappropriate. During this conversation Bullock asked why employees wanted a union. In a brief response, Folden told him that there were several reasons, including favoritism and the lack of fair treatment.

Bullock had joined Medeco in August 1993 as manager of the Quality Control (QC) Department. His management style reflected Medeco's "Team Concept" and its commitment to employee participation. Bullock soon established three skill levels for the quality inspectors in the QC Department, with level III being the most skilled. The job descriptions associated with each skill level were developed with input from the QC employees, and in January 1994 the employees were allowed to choose their own skill level based on their own assessment of their capabilities. Of the ten QC inspectors, Folden and two others rated themselves at level III, while the rest selected level II.

Bullock also required that all QC employees pass a Geometric Dimension and Tolerance (GD&T) exam, which would test their ability to interpret engineering drawings. To prepare them for the GD&T test, Bullock provided books and access to instructional videos that the employees could use on their own time. Because Bullock felt that "it would be difficult for the group to complete[the test] without some instruction," he also taught a series of classes on the exam over several weeks and made himself available to answer questions. Folden attended these classes but illness caused him to miss the last two sessions, in which course materials were reviewed in preparation for the exam. Folden took the test on April 7, 1994, and scored a 68.5 percent.

Because Bullock had promised that the team as a whole would participate in making decisions, he told them before the test that they would decide the passing grade. Once the QC inspectors knew their scores, they held a meeting and voted to make 70 percent the passing

5

score. Folden's score of 68.5 was the lowest in the group, and he was the only one who did not pass.

At this point the testimony diverges. Folden claims Bullock told him that he (Bullock) would schedule another GD&T exam in the next few weeks, while Bullock claims that he told Folden to retake the exam within the next five days. It is undisputed, however, that on April 20 Bullock met with Folden to discuss the retaking of the exam. In this meeting Bullock had Folden sign a memorandum that restated Bullock's version of their previous discussions on the subject. Additionally, the memorandum stated that Folden was to retake the GD&T exam by April 23 and score at least 80 percent in order to maintain his level III classification. Regardless of how well Folden might do, the memo provided that he would "be the lowest qualified in the level III classification" because of his "need to retake [the exam] and [the] additional time allowed." Finally the memo included the following "confidentiality statement":

> This conversation between Steve Bullock . . . and Billy Folden . . . in regards to Billy's performance . . . and the corrective action that must take place no later than April 23, 1994 is strictly confidential. Any sharing of this information with any other member(s) of Team Medeco will be interpreted as disruptive in nature and result in termination . . ..

Bullock would testify later that the purpose of this confidentiality statement was to avoid any perception of favoritism that might be drawn from the extra time Folden was given to take the test. After the April 20 meeting with Bullock, Folden prepared to retake the exam with the help of Mike Furrow, a fellow level III inspector, who shared his notes and answered Folden's questions. When Folden retook the GD&T exam, he increased his score to 86 percent.

The GD&T, however, was only one of two tests taken by the Quality Control group. In 1993 and continuing though 1994, Medeco strongly emphasized a training program known as Quality Skills 1 (QS-1). QS-1 was a largely voluntary program through which Medeco sought to improve the skills of its employees in various subject areas important to the company's business.[2] Because the company wanted

_____

[2] Although the program was voluntary for most employees, the QC inspectors were required to take QS-1 training.

6

a high degree of employee participation, Medeco offered a twenty-five-cent hourly wage premium as an incentive to certain employees who completed QS-1 training. Despite this incentive many employees still were hesitant to participate and take the QS-1 diagnostic tests. To encourage more employees to volunteer for the training, Medeco attempted to address employee concerns by emphasizing that only the wage premium was tied to the QS-1 exams, that no one could "fail" the QS-1 program, and that the company would not base its assessment of an employee's qualifications on QS-1 test performance.

Confusion surrounding these two exams, QS-1 and GD&T, eventually led to Folden's termination. The final chain of events began soon after Folden retook his GD&T test on April 23, 1994.

As a consequence of a reorganization of the QC group's shift structure, a position on the second (evening) shift was left vacant when one employee transferred out of the group in April of 1994. In order to deal with this vacancy, Bullock first asked for a volunteer to fill the position but no one stepped forward. He then recommended that the inspectors on the first shift take turns rotating through the second shift so that everyone (both level II and III inspectors) would share equally in the burden of working evening hours. Consistent with his "team" approach to management, Bullock had the group vote on his proposal. Although the first vote adopted the rotation plan, a second vote was taken because one employee changed his mind and another was not present for the first vote. After the second vote rejected the plan, Medeco posted a job notice for the second-shift position on April 29, 1994. This notice described job requirements that were consistent with the skills of a level III inspector.

When no one responded to the notice, Bullock told Folden that because he (Folden) was the least qualified of the level III inspectors, the Medeco handbook required that he be transferred from the first to the second shift. Folden testified that when he objected to the second-shift assignment, Bullock told him that QS-1 and GD&T scores determined the assignment and that Folden's scores on both tests made him the least qualified inspector. Bullock denied this, claiming that the GD&T scores alone made Folden the least qualified, as reflected by the April 20 memorandum. Mike Furrow, another level III inspector, claims that he approached Bullock and registered a complaint,

7

saying that it was unfair to transfer Folden because Folden's second GD&T score was higher than his. Furrow testified that Bullock responded by showing him a spreadsheet printout with test scores that included QS-1 scores. Bullock denied showing him these sheets, but the ALJ found Furrow's version to be credible. The ALJ thus found that Bullock told Furrow that he based his decision to transfer Folden on both the GD&T and QS-1 test scores.

On May 26, 1994, nine days after the transfer, Folden read an article in the company newsletter which said that an employee could not be transferred to a new shift because of his QS-1 scores. This article was a response to rumors that QS-1 scores were a factor in Folden's transfer to the second shift. After reading the newsletter, Folden went to two supervisors and told them that he thought the article was wrong. These supervisors, in turn, informed Bullock of what Folden had said.

The next day, Bullock called Folden into his office and questioned him in the presence of Robert King, another Medeco supervisor. Bullock handed the April 20 memorandum to Folden and asked him if there was something that he did not understand. The memo clearly stated that Folden would be considered the least qualified level III inspector because of his GD&T score and that the discussions at the April 20 meeting would be kept confidential. Bullock claims that Folden gave no response, Folden claims that he was not allowed to respond, and King claims that Folden repeatedly answered "I don't know." Bullock then fired Folden. Bullock contends this action was because Folden lied about the reason for his transfer, but both Folden and King testified that Bullock said that Folden was fired for the "disruptive behavior" of telling others that he was transferred because of his test scores. Folden tried to explain to Bullock as he was being escorted out of the plant that there had been a misunderstanding, but Bullock did not give him an opportunity to explain himself. The ALJ and the Board found that Folden's termination and his prior transfer to the second shift were both motivated by anti-union animus and that the April 20 "confidentiality statement" illegally restricted rights protected by the National Labor Relations Act ("NLRA" or "Act").

B.

Louis Rickman worked for Medeco from 1985 until he quit his job in November of 1994. In early October 1994 Rickman received a

8

head injury in his ninth job-related accident in less than three years. Because of this history of accidents, Rickman was suspended pending a "fitness for duty exam," Medeco's term for a drug screening test. Rickman ultimately tested negative for drug use. However, Rickman was told orally by his supervisor and in a memorandum that he could not discuss the drug test with other employees. Specifically, the memorandum prohibited him from having "discussions pertaining to [the] fitness for duty exam with co workers as this would be disruptive to our team concept and result in further disciplinary actions." When he was told this by his supervisor, Rickman answered by saying that "the plant was already aware that I was suspended [and that t]he rumor was that I was suspended for use of cocaine and marijuana." Rickman added that he "didn't appreciate being labeled as a drug user." The ALJ and the Board later ruled that this restraint on Rickman's speech violated the Act.

C.

On September 23, 1994, the Union initiated this case by filing unfair labor practice charges with the National Labor Relations Board. The General Counsel issued a complaint on October 24, which was amended three times. After a hearing was held before an administrative law judge (ALJ) on March 16, 1995, the ALJ ruled that Medeco had committed several violations of the National Labor Relations Act. The ALJ found (1) that Medeco violated § 8(a)(1) of the Act by restricting the communications of Folden and Rickman and (2) that it violated both § 8(a)(1) and § 8(a)(3) because its transfer and termination of Folden were motivated by anti-union animus. Medeco appealed to the Board, which affirmed and adopted the ALJ's decision and order. See Medeco Sec. Locks, Inc., 319 N.L.R.B. 224 (1995) (Medeco I). Medeco then petitioned this court for review, but we remanded the case to the Board at its request. The Board then remanded the case to the ALJ for specific credibility determinations. After the ALJ filed a supplemental decision that failed to address the substance of the Board's remand order, the Board again remanded the case for the same purpose. See Medeco Sec. Locks, Inc., 322 N.L.R.B. 664, 664-67 (1996) (Medeco II) (supplemental decision). The ALJ thereafter filed a second supplemental decision that the Board affirmed. See id. at 664, 667-68 (second supplemental decision and

9

affirmance). Medeco now petitions this court for review, and the Board cross-petitions for enforcement.

II.

Section 8(a)(3) of the Act prohibits an employer from engaging in "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). Generally, an employer violates this section "only if its actions are motivated by anti-union animus." Goldtex, Inc. v. NLRB, 14 F.3d 1008, 1011 (4th Cir. 1994). Because substantial evidence does not support the Board's finding that Folden's transfer to the second shift and his subsequent termination were motivated by anti-union animus, we deny enforcement as to the finding of a § 8(a)(3) violation.

Because an employer's motives may often be a mix of legitimate and discriminatory reasons, the Board established a procedure in Wright Line, 251 N.L.R.B. 1083 (1980), enforced, 662 F.2d 899 (1st Cir. 1981), to deal with such mixed-motive cases. See also NLRB v. Transportation Management Corp., 462 U.S. 393, 401-02 (1983) (approving Wright Line procedure), modified in part, Director, Office of Workers' Compensation Programs v. Greenwich Collieries, 512 U.S. 267, 276-78 (1994). Under Wright Line the General Counsel first bears the burden of making a prima facie case that the employer's adverse employment decision was motivated in part by discriminatory intent. See FPC Holdings, Inc. v. NLRB, 64 F.3d 935, 942 (4th Cir. 1995); Ultrasystems W. Constructors, Inc. v. NLRB, 18 F.3d 251, 257 (4th Cir. 1994). To establish a prima facie case, the General Counsel must prove by a preponderance of the evidence:

> (1) that the employee was engaged in protected activity, (2) that the employer was aware of the activity, and (3) that the activity was a substantial or motivating reason for the employer's action. Motive may be demonstrated by circumstantial as well as direct evidence, and is a factual issue "which the expertise of the Board is peculiarly suited to determine."

FPC Holdings, 64 F.3d at 942 (citations omitted); see also NLRB v. CWI, Inc., 127 F.3d 319, 330-32, 331 n.7, 332 n.8 (4th Cir. 1997)

10

(standard of proof for prima facie case is preponderance of evidence based on whole record). Of course, the absence of a legitimate basis for an employer's action may form part of the proof of the General Counsel's case, while the presence of legitimate reasons can work to negate proof of anti-union animus. See CWI, 127 F.3d at 332 (quoting Wright Line, 251 N.L.R.B. at 1088 n.12). Even if an employer's motivation is "combined with other legitimate nondiscriminatory motives," however, a prima facie case is nevertheless established when "anti-union animus was a [substantial or] motivating factor" in the employment action. See Ultrasystems, 18 F.3d at 257.

Once a prima facie case has been made, the employer may still escape liability by presenting the affirmative defense that the discriminatory motivation, though illicit, was harmless. See Transportation Management, 462 U.S. at 401-02; Ultrasystems, 18 F.3d at 257. To make this defense, the employer bears the burden of proving by a preponderance of the evidence that, even though discriminatory animus was present, "the employer nonetheless would have taken the same employment action for legitimate reasons." Ultrasystems, 18 F.3d at 257; see also Greenwich Collieries, 512 U.S. at 278 (employer has burden of persuasion to sustain this affirmative defense); Transportation Management, 462 U.S. at 402; FPC Holdings, 64 F.3d at 942. If the Board finds that the proffered reason is pretextual, we must affirm the Board if substantial evidence supports this factual determination. See NLRB v. Grand Canyon Mining Co., 116 F.3d 1039, 1047 (4th Cir. 1997).

The scope of our inquiry in reviewing the Board is limited. We must affirm the Board's interpretations of the NLRA if they are "rational and consistent with the Act." NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 787 (1990) (citation omitted); see also Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 42 (1987); Transportation Management, 462 U.S. at 402-03; NLRB v. J. Weingarten, Inc., 420 U.S. 251, 266-67 (1975). Similarly, we must affirm the Board's factual findings if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); see also CWI, 127 F.3d at 326; Fieldcrest Cannon, Inc. v. NLRB, 97 F.3d 65, 69-70 (4th Cir. 1996). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and if we find such evidence on the record, we must

11

uphold the Board's decision "even though we might have reached a different result had we heard the evidence in the first instance." Alpo Petfoods, Inc. v. NLRB, 126 F.3d 246, 250 (4th Cir. 1997) (internal quotation omitted); see also Grand Canyon, 116 F.3d at 1044.

In this case, the Board adopted the ALJ's finding that anti-union animus motivated Medeco's decision to transfer and later terminate Folden. Because motive is a question of fact, we review this finding only to determine if it is supported by substantial evidence. See Alpo, 126 F.3d at 250 (quoting FPC Holdings, 64 F.3d at 942); Grand Canyon, 116 F.3d at 1047. While motive may be proven with circumstantial evidence, "mere speculation as to the employer's real motives" is insufficient and will not be upheld as substantial evidence. Alpo, 126 F.3d at 250 (alteration and internal quotation omitted); see also Carry Cos. v. NLRB, 30 F.3d 922, 928 (7th Cir. 1994) ("sheer speculation" is not substantial evidence). The ALJ found that Medeco knew of Folden's renewed union activities in 1994 because of Folden's prominent role in the 1993 campaign, his union participation in 1994, and Folden's discussion with Bullock after the February 4 meeting of the cross-functional team. See Medeco I, 319 N.L.R.B. at 228. The ALJ further found that Medeco's anti-union propaganda exhibited anti union animus. Id. Because neither conclusion is supported by substantial evidence on the record, we hold that the General Counsel failed to prove a prima facie case of discrimination under § 8(a)(3). We now discuss each of these findings in greater detail.

A.

In Goldtex, Inc. v. NLRB we emphasized that "the most basic element" of many § 8(a)(3) cases is a showing "that the employer was . . . aware of the discharged employees' protected activities." 14 F.3d 1008, 1011, 1012-13 (4th Cir. 1994). The ALJ found that Medeco knew of Folden's renewed union activities in the 1994 campaign and relied on this finding to infer animus from the events surrounding his transfer to the second shift and his eventual termination. See Medeco I, 319 N.L.R.B. at 228. This finding is not supported by substantial evidence, however.

Folden's only open act of aid to the 1994 organizing drive was his receipt of some union cards in the employee parking lot. There was

12

no evidence that Medeco had any knowledge of this. Of course, if Folden's organizational work or his expressions of support for the union had been more apparent or more extensive, knowledge of his protected activities could be imputed to Medeco. See NLRB v. Instrument Corp. of America, 714 F.2d 324, 329, 330 (4th Cir. 1983) (knowledge of union activities may be "imputed to the company" from circumstantial evidence). However, there is nothing more of consequence here. Folden's testimony confirms that he played a minor role in the 1994 campaign. Even though Folden was a visible union supporter in 1993, he affirmatively disavowed any further interest in the union to management just before the 1994 campaign. It was reasonable for Medeco to take Folden at his word, particularly in light of the changes at the company and Folden's acknowledgment that things were improving.

We also conclude that Folden's complaint to Bullock concerning Norma Doudy's inquiry about the level of union support during the cross-functional team meeting does not constitute substantial evidence that Medeco knew of Folden's union activity. We agree with Medeco that this incident is similar to the one in Carry Cos. v. NLRB, 30 F.3d 922, 927 (7th Cir. 1994). There an employee-warehouseman said in the presence of a supervisor that company drivers "`had enough authorization cards signed to have an election for the Union, and that the warehousemen should decide what they were going to do.'" The court concluded that this comment "did not indicate [the employee's] view of or participation in the union campaign, and any conclusion to the contrary[ ] is sheer speculation" that did not amount to substantial evidence. Id. at 928. Likewise, Folden's complaint did not reveal either his support of or participation in union activity; it merely reflected his concern that the union drive was not a proper topic at the team meeting. When Folden was asked by Bullock why employees wanted a union, Folden simply gave a brief, factual answer without expressing his own opinion.

Moreover, the fact that Bullock asked Folden this question is itself unremarkable. This is not a case where a supervisor approached an employee out of the blue to ask about the reasons behind a unionization drive. In such a case where the employee was known to have supported the union in the past, a factfinder might properly infer that the supervisor's decision to ask this specific employee about the union

13

reflected management's knowledge of the employee's continued union support. Here, however, Folden served on a Medeco committee whose very function was to collect employee concerns and pass them on to management. Moreover, Folden himself raised the union issue (although in a neutral fashion) by bringing his complaint about Doudy to Bullock. Together, these facts illustrate that Bullock's question about why employees wanted a union, when viewed in context, is not substantial evidence to support a finding that Medeco knew of Folden's union sympathies.

Folden's minimal role in the 1994 campaign, his clear expression to management that he no longer was interested in the union, the neutral nature of his complaint about Doudy's question at the team meeting, and the benign nature of Bullock's question to Folden all lead us to conclude that there is a lack of substantial evidence to support the finding that Medeco was aware of Folden's union activity.

B.

We recognize that a company can violate § 8(a)(3) by disciplining or firing employees who are not union sympathizers in an effort to send an anti-union message or to otherwise discourage union membership. Nevertheless, some evidence of anti-union animus is essential for such a case, see Alpo, 126 F.3d 255-56 (citing cases), and that evidence is not present here.

The ALJ relied on Medeco's anti-union propaganda campaign to support his finding of "company animus against the Union." Medeco I, 319 N.L.R.B. at 228. This finding cannot stand. "[A]n employer's speech that does not threaten reprisal or force, or promise a benefit, in relation to union activities is unqualifiedly privileged under [§ 8(c) of] the Act." Alpo, 126 F.3d at 252; see also 29 U.S.C. § 158(c); Louisberg Sportswear Co. v. NLRB, 462 F.2d 380, 385-86 (4th Cir. 1972) (company propaganda campaign presenting truthful but skewed perspective that portrayed unions "in a most unfavorable light" was protected since it did not threaten reprisal or promise benefit); Corrie Corp. v. NLRB, 375 F.2d 149, 153 (4th Cir. 1967) (finding employer's statement was not protected in light of other circumstances that made statement coercive). Section 8(c) plainly states that the

14

> expressi[on] of any views, argument, or opinion, or the dis-
> semination thereof, whether in written, printed, graphic, or
> visual form, shall not constitute evidence of an unfair labor
> practice . . . [unless it] contains [a] threat of reprisal or force
> or promise of benefit.

29 U.S.C. § 158(c). Consequently, speech protected by that section cannot be used by the General Counsel to establish an employer's anti-union animus. See Alpo, 126 F.3d at 252. Otherwise "[a]n employer's lawful anti-union speech [would] be chilled by the return threat that the Board may use it as evidence of unlawful motivation." Id. This impermissible result would completely undermine § 8(c) by rendering its protection an empty promise.

Medeco's propaganda campaign clearly falls within the protection of § 8(c) because there is no indication that the company's speech was coercive or contained any implicit threats or promises of benefits. Thus, evidence about the company's campaign cannot be used by the General Counsel to prove anti-union animus.

In sum, there is no substantial evidence to support either the Board's conclusion that Medeco knew of Folden's pro-union activities or its conclusion that Medeco exhibited anti-union animus more generally. As a result, the General Counsel has failed to establish a prima facie case, and the Board's ruling that Medeco violated § 8(a)(3) cannot be enforced.

III.

We now turn to the § 8(a)(1) violations, where substantial evidence does support the Board's findings. The evidence clearly reveals that Medeco committed three independent violations of § 8(a)(1) by prohibiting Folden and Rickman from discussing matters concerning the conditions of their employment and by firing Folden for discussing such matters.

Section 8(a)(1) of the National Labor Relations Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" § 7 of

15

the Act. 29 U.S.C. § 158(a)(1). If protected activity is implicated, the well-settled test for § 8(a)(1) violations is whether, "under all the circumstances, the employer's conduct may reasonably tend to coerce or intimidate employees." NLRB v. Grand Canyon Mining Co., 116 F.3d 1039, 1044 (4th Cir. 1997); see also Equitable Gas Co. v. NLRB, 966 F.2d 861, 866 (4th Cir. 1992). It matters "`not whether the [employer's] language or acts were coercive in actual fact.'" Equitable Gas, 966 F.2d at 866; see also Corrie Corp. v. NLRB, 375 F.2d 149, 153 (4th Cir. 1967). Our inquiry instead focuses on "`whether the conduct in question had a reasonable tendency in the totality of circumstances to intimidate.'" Equitable Gas, 966 F.2d at 866. This question of "[w]hether particular conduct is coercive is a `question essentially for the specialized experience of the NLRB,'" Grand Canyon, 116 F.2d at 1044, and we grant considerable deference to its determinations.

Establishing the existence of coercive conduct, however, does not end our analysis. We must balance the employee's protected right against any substantial and legitimate business justification that the employer may give for the infringement. "[I]t is only when the interference with § 7 rights outweighs the business justification for the employer's action that § 8(a)(1) is violated." Textile Workers Union of America v. Darlington Mfg. Co., 380 U.S. 263, 269 (1965); see also Eastex, Inc. v. NLRB, 437 U.S. 556, 570-74 (1978) (balancing interests); J.P. Stevens & Co. v. NLRB, 547 F.2d 792, 794 (4th Cir. 1976). This determination is also squarely within the expertise of the Board. "`[I]t is the primary responsibility of the Board and not the courts `to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy."'" Jeannette Corp. v. NLRB, 532 F.2d 916, 918 (3d Cir. 1976) (quoting NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 378 (1967)). On review, we must affirm the Board's balancing if it is rational and consistent with the Act. See Beth Israel Hosp. v. NLRB, 437 U.S. 483, 501 (1978); see also Charles D. Bonanno Linen Serv., Inc. v. NLRB, 454 U.S. 404, 409-10, 417 (1982).

Consequently, an independent violation of § 8(a)(1) exists when (1) an employer's action can be reasonably viewed as tending to interfere with, coerce, or deter (2) the exercise of protected activity, and (3) the employer fails to justify the action with a substantial and legitimate business reason that outweighs the employee's § 7 rights.

16

A.

1.

To determine if Medeco violated § 8(a)(1) by prohibiting Folden from talking to other employees about his test score performance and its effect on his transfer, we must determine if the above three conditions are met. Because the confidentiality statement's sanction of termination clearly is coercive, we turn our focus to whether Medeco's action implicates protected conduct.

An employer's coercive action affects protected rights whenever it can have a deterrent effect on protected activity. See NLRB v. Vanguard Tours, Inc., 981 F.2d 62, 66-67 (2d Cir. 1992); Jeannette, 532 F.2d at 918. This is true even if an employee has yet to exercise a right protected by the Act. The rationale for this rule is straightforward. Section 8(a)(1) reaches all acts by employers that "interfere with, restrain, or coerce" their employees' exercise of protected rights, see 29 U.S.C. § 158(a)(1), and this requires that the section reach employer conduct even when employees have yet to engage in protected activity. As we state above, the test is not whether the employer's action was coercive in fact, but whether it reasonably tends to coerce or deter the exercise of protected rights. We find that Medeco's blanket prohibition against discussing the circumstances surrounding Folden's transfer affected protected rights because it covered communications that would be protected by the Act.

The right of employees "to engage in . . . concerted activities for the purpose of . . . mutual aid or protection" is established by § 7 the National Labor Relations Act. See 29 U.S.C.§ 157. This protection applies even to activities that do not involve unions or collective bargaining. Halstead Metal Prods. v. NLRB, 940 F.2d 66, 69 (1991). Thus, any actions taken by employees that are both (1) concerted and (2) performed for the purpose of mutual aid or protection are protected by the Act. See New River Indus. v. NLRB, 945 F.2d 1290, 1294 (4th Cir. 1991).

We have previously recognized that action by an individual is a "concerted" action under the Act so long as it is "`intended to enlist the support and assistance of other employees.'" Krispy Kreme

17

Doughnut Corp. v. NLRB, 635 F.2d 304, 307-08, 307 n.6 (4th Cir. 1980) (following Mushroom Transp. Co. v. NLRB, 330 F.2d 683, 685 (3d Cir. 1964)); see also Blaw-Knox Foundry & Mill Machinery Inc. v. NLRB, 646 F.2d 113, 115-116 (4th Cir. 1981). Folden's discussion of the events surrounding his transfer certainly could be a central part of any effort to enlist the support of his coworkers in addressing the terms and conditions of their employment. It is clear in this case that the possible impact of the GD&T and QS-1 test scores on an employee's qualifications was an issue of common concern to employees. Employee discussions of these topics in the midst of a union campaign could clearly be protected activities that are concerted and performed for mutual aid and protection. Information about such issues is the very fuel on which unionization campaigns are run, and to prevent the dissemination of first-hand accounts of a company's treatment and evaluation of its employees frustrates the rights that § 7 seeks to protect.**3**

Medeco's action in prohibiting such discussions is thus no different than other blanket rules prohibiting the discussion of employment conditions that have repeatedly been held to violate the Act. See, e.g., Handicabs, Inc. v. NLRB, 95 F.3d 681, 684-85 (8th Cir. 1996) (rule prohibiting employees from discussing problems or complaints about company with customers was invalid because it was not narrowly drawn); Aroostook County Reg'l Ophthalmology Ctr. v. NLRB, 81 F.3d 209, 212 (D.C. Cir. 1996) (acknowledging that, "under the NLRA, employees are generally free to discuss the terms and conditions of their employment"); Wilson Trophy Co. v. NLRB, 989 F.2d 1502, 1510-11 (8th Cir. 1993) (rule banning wage discussions during working hours was invalid where its application to break times was not justified by productivity or safety concerns); NLRB v. Vanguard Tours, Inc., 981 F.2d 62, 66-67 (2d Cir. 1992) (rule prohibiting employees from discussing issues such as hours, wages, and workplace conditions violated § 8(a)(1) "even absent evidence of [its] enforcement"); Jeannette, 532 F.2d at 918 & n.2, 920 (rule prohibiting wage discussions violates § 8(a)(1) because wage discussions can

_____

**3** We need not decide whether Folden's actual conversations were protected by the Act. It is enough to conclude that the "confidentiality statement" affected discussions that could be protected by the Act. See Jeannette, 532 F.2d at 918 & n.2, 920.

18

be protected activity; declining to rule whether actual discussions were protected); Waco, Inc., 273 N.L.R.B. 746, 747-48 (1984) (unenforced rule banning discussion of wages invalid when not justified by "substantial and legitimate business reasons"); IBM Corp., 265 N.L.R.B. 638, 638 (1982) (finding policy that forbid discussion of internal records of employee wages infringes on § 7 rights, but ruling that policy was justified by confidentiality concerns). The danger inherent to such rules, even when they are not enforced, is their "likely chilling effect" on protected rights. See Vanguard Tours, 981 F.2d at 67. Because of its potential to deter protected activities, we hold that Medeco's blanket prohibition against Folden's discussion of the circumstances surrounding his transfer was coercive and implicates protected conduct.

Therefore, we address the third requirement of a§ 8(a)(1) violation by balancing Medeco's business justification for this restriction against its employees' § 7 rights. Bullock testified that "[t]he intent of the confidentiality statement . . . was to ward off any perception of favoritism that . . . could have been interpreted[from] giving [Folden] additional time to take the exam." This reason, however, is not a substantial and legitimate business reason that would justify Medeco's infringement on employee rights. Any perceived favoritism could most easily be dispelled by fully disclosing the facts and the rationale behind Bullock's decision. Given that Folden was ill and absent from the last GD&T review classes, employees might easily conclude that Bullock acted fairly in giving Folden another chance at the exam and that no favoritism existed. On the other hand, if employees were to find this treatment preferential, this type of information would be essential to the very discussions about working conditions that the Act protects. Suppressing this discussion by prohibiting employees from sharing the facts surrounding the terms and conditions of their employment cannot be justified here. We therefore conclude that the confidentiality statement is coercive and implicates protected rights that are not outweighed by a substantial and legitimate business justification. As such, we hold that it violates § 8(a)(1).

Medeco's assertion that it lacks anti-union animus does not affect this determination. Unlike violations of § 8(a)(3), an employer's anti-union motivation is not a required element of § 8(a)(1). See Standard-Coosa-Thacher Carpet Yarn Div., Inc. v. NLRB, 691 F.2d 1133, 1138

19

& n.6 (4th Cir. 1982) (courts reviewing independent§ 8(a)(1) violations decide if employer's actions are coercive and do not inquire into anti-union animus; this discriminatory intent is element of § 8(a)(3) alone). The Board has long held that "interference, restraint, and coercion under Section 8(a)(1) of the Act does not turn on the employer's motive," see American Freightways Co., 124 N.L.R.B. 146, 147 (1959), and the federal courts have reflected this position. See, e.g., Textile Workers Union of America v. Darlington Mfg. Co., 380 U.S. 263, 269 (1965) ("A violation of § 8(a)(1) alone . . . presupposes an act which is unlawful even absent a discriminatory motive."); NLRB v. Burnup & Sims, Inc., 379 U.S. 21, 22-24 (1964) (finding violation of § 8(a)(1) "whatever the employer's motive"); Wyman-Gordon Co. v. NLRB, 654 F.2d 134, 145 (1st Cir. 1981) (test is objective coerciveness; employer intent is not part of offense); Caterpillar Tractor Co. v. NLRB, 638 F.2d 140, 141 (9th Cir. 1981) (no need to inquire into motive if employer does not have legitimate business justification); National Cash Register Co. v. NLRB, 466 F.2d 945, 962-63 (6th Cir. 1972) ("lack of unlawful motive is not a defense to a section 8(a)(1) charge"); Crown Central Petroleum Corp. v. NLRB, 430 F.2d 724, 727-29 (5th Cir. 1970) (unlike § 8(a)(3),§ 8(a)(1) does not require "unlawful motive"); Welch Scientific Co. v. NLRB, 340 F.2d 199, 203 (2d Cir. 1965) ("cases clearly demonstrate that it is the tendency of an employer's conduct to interfere with the rights of his employees protected by Section 8(a)(1), rather than his motives, that is controlling"). As the Supreme Court explained in Burnup, this rule that intent is not a necessary element of § 8(a)(1) is

> in conformity with the policy behind [that section]. Otherwise the protected activity would lose some of its immunity . . . . A protected activity acquires a precarious status if innocent employees can be discharged while engaging in it, even though the employer acts in good faith. It is the tendency of those discharges to weaken or destroy the§ 8(a)(1) right that is controlling.

379 U.S. at 23-24.[4] Consequently, Medeco's claim that the evidence

---

[4] While anti-union animus may come into play in analyzing whether the employer's justification is legitimate, it is not an element of § 8(a)(1).

fails to show discriminatory intent cannot save it from liability under § 8(a)(1).

2.

Because we hold that Medeco's "confidentiality statement" violates § 8(a)(1), it is also clear that Folden's termination for his breach of this confidentiality also violates § 8(a)(1). Although Medeco claims that Folden was terminated for lying and that he was not fired for discussing his transfer, the ALJ's factual findings fatally undermine this argument. First, the ALJ found that Folden was telling the truth and that Bullock had in fact told both Folden and Furrow that QS-1 and GD&T scores were used in the transfer decision. See Medeco II, 322 N.L.R.B. at 664 & n.2, 667-68; Medeco I, 319 N.L.R.B. at 226. In reaching this conclusion, the testimony of both Folden and Furrow was credited, and we see no reason to question this credibility determination.

_____

See National Cash Register, 466 F.2d at 963 ("the absence of improper motive is relevant only to the extent it makes credible the asserted existence of legitimate business reasons for the employer's decision"). Similarly, cases recognizing that anti-union animus can transform an otherwise legitimate act into a coercive act which violates § 8(a)(1) do not change this conclusion. See, e.g., NLRB v. Exchange Parts Co., 375 U.S. 405, 409 (1964) (employer's provision of benefit to employees made with "express purpose" of discouraging unionization violates § 8(a)(1)); Halstead Metal Prods. v. NLRB, 940 F.2d 66, 70-71 (4th Cir. 1991) ("retaliatory action motivated by an employee's participation in, or instigation of, [protected] activity violates section 8(a)(1)").

We also note that cases sometimes fail to distinguish carefully between independent § 8(a)(1) violations and derivative violations which require motive. This confusion arises because a § 8(a)(3) violation necessarily involves a "derivative violation of § 8(a)(1)." Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 698 n.4 (1983); see also New River Indus. v. NLRB, 945 F.2d 1290, 1295 n.3 (4th Cir. 1991); Microimage Display Div. of Xidex Corp. v. NLRB, 924 F.2d 245, 250 (D.C. Cir. 1991) (violations of § 8(a)(2)-(5) yield derivative violations of § 8(a)(1)). Consequently, cases which involve both § 8(a)(1) and (3) may blur the line between these two offenses.

21

The ALJ also found that when Bullock fired Folden, Bullock told him that he had "violated the `confidentiality' statement and had been disruptive." Medeco I, 319 N.L.R.B. at 227. This is corroborated not only by Folden's testimony but also by that of Robert King, a plant supervisor. King, who was present at the May 27, 1994, termination meeting, testified that Bullock told Folden that Folden's discussions with fellow employees about his transfer were "considered disruptive behavior [constituting] grounds for dismissal and, therefore, he would be dismissed effective immediately." Consequently, it is clear from the record that Folden was fired not for "lying" but instead for his violation of the confidentiality agreement, which provided that "[a]ny sharing of this information with any other [employees] will be interpreted as disruptive in nature and result in termination." Because the memo's prohibition standing alone violates § 8(a)(1), § 8(a)(1) also forbids firing Folden for violating this illegal prohibition.

B.

When Medeco forbade Lewis Rickman from discussing his required drug test, this restriction had a reasonable tendency to deter the exercise of protected rights for the same reason that the "confidentiality statement" did. Moreover, Medeco's justification that not discussing the incident would better protect Rickman's reputation clearly falls short since Rickman himself wanted to dispel rumors that he was suspended for cocaine and marijuana use. The best way to do this would have been to reveal that Rickman passed the drug screen. This is not a situation in which a company forbids an employee from discussing another's drug test without permission. That prohibition could be a substantial and legitimate business reason based on concerns for the tested employee's privacy. Cf. IBM Corp., 265 N.L.R.B. 638, 638 (1982) (policy that forbid discussion of internal records of employee wages was justified by need to keep wages of company's employees confidential; policy did not prevent discussion of employee's own wages). Here, Rickman's reputation is a matter of personal concern to him, and the company cannot legitimately prevent him from attempting to air the facts in a manner that he believes will restore his good name. Consequently, we affirm the Board's ruling that Medeco restricted Rickman's speech in violation of § 8(a)(1).**5**

_____

**5** Medeco's claim that it was denied a fair hearing because the ALJ was biased is without any merit. We find no evidence of bias on this record.

22

IV.

Because substantial evidence does not support the Board's finding of anti-union animus, we deny enforcement of the Board's order insofar as it relates to the transfer of Folden to the second shift. However, we grant enforcement of the Board's order as to the violations of § 8(a)(1) that resulted from Medeco's restriction of employee communications and from the termination of William Folden.

ENFORCEMENT GRANTED IN PART
AND DENIED IN PART

---

Similarly, Medeco's citation to prior cases over which the ALJ presided is irrelevant to the issues raised in this proceeding. See Fieldcrest Cannon, Inc. v. NLRB, 97 F.3d 65, 69 (4th Cir. 1996) ("A decision-maker's ruling deserves to rise or fall on the case at hand, not on the results in other cases that have little bearing on the issues before us.").

23