**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

CONSOLIDATED DIESEL COMPANY,
*Petitioner,*

v.

NATIONAL LABOR RELATIONS BOARD,
*Respondent,*

CDC WORKERS UNITY COMMITTEE,
*Intervenor.*

No. 00-2545

NATIONAL LABOR RELATIONS BOARD,
*Petitioner,*

CDC WORKERS UNITY COMMITTEE,
*Intervenor,*

v.

CONSOLIDATED DIESEL COMPANY,
*Respondent.*

No. 01-1064

On Petition for Review and Cross-Application for
Enforcement of an Order
of the National Labor Relations Board.
(11-CA-16792, 11-CA-16350, 11-CA-16183)

Argued: June 6, 2001

Decided: August 15, 2001

Before WILKINSON, Chief Judge, TRAXLER, Circuit Judge,
and Andre M. DAVIS, United States District Judge for the
District of Maryland, sitting by designation.

Application for enforcement granted by published opinion. Chief Judge Wilkinson wrote the opinion, in which Judge Traxler and Judge Davis joined.

---

**COUNSEL**

**ARGUED:** Glenn Littleton Spencer, HAYNSWORTH, BALDWIN, JOHNSON & GREAVES, L.L.C., Greenville, South Carolina, for Consolidated Diesel. Michael R. Lewis, Senior Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. M. Travis Payne, EDELSTEIN & PAYNE, Raleigh, North Carolina, for Intervenor. **ON BRIEF:** Leonard R. Page, Acting General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Howard E. Perlstein, Deputy Assistant General Counsel, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board.

---

**OPINION**

WILKINSON, Chief Judge:

Consolidated Diesel Company challenges the National Labor Relations Board's decision that it violated § 8(a)(1) of the National Labor Relations Act by interfering with its employees' right to self-organization protected by § 7 of the Act. Specifically, the Board held that the Company (1) subjected employees to a formal disciplinary procedure after it had become clear that their conduct was protected by § 7, and (2) confiscated union literature placed in nonwork areas during nonwork time. In general, employers enjoy broad authority to investigate allegations of employee misconduct. Here, however, because substantial evidence supports the Board's finding that the employees had done nothing more than legitimately exercise core § 7 rights, and because the confiscations of union literature were unlawful, we deny Consolidated's petition for review and grant the Board's cross-application for enforcement.

## I.

## A.

Consolidated Diesel maintains a harassment policy which provides that "[a]ny unwelcome action, intended or not, which is considered offensive to the receiver or a third party may be labeled harassment." The policy also instructs that "[i]f you have been the recipient or the observer of a situation which appears to be harassment, . . . Human Resources should be notified immediately by either you or your manager." The Human Resources Department allocates initial investigative responsibility to one of its employee relations representatives. The representative reports the results of her investigation to the employee relations manager, who determines whether the matter should be referred to its Performance Management Process Committee (PMPC). In attendance at the meeting of the Committee are the accused employee and his or her chosen employee-advocate, the employee who complained about or witnessed the alleged misconduct, the employees' respective supervisors, the employee relations representative who initially investigated the incident, and the employee relations manager. The Committee decides what disciplinary action to take, if any, up to and including termination.

## B.

As part of their effort to organize a union at Consolidated since at least 1992, the employees of CDC Workers Unity Committee periodically publish a leaflet entitled the Unity News. One way in which they distribute the newsletter is to leave copies in team rooms where employees take breaks and eat lunch.

### 1. *Fernando Losada*

On November 17, 1994, Fernando Losada and Watt Avent entered the upfit team room and began putting copies of a new Unity News in front of the members seated therein, one of whom was David Duke. When Losada offered him a copy, Duke said that "you're screwing with my lunch," and told Losada to leave. As he walked towards the door, Losada commented that Duke's view appeared rather "one-

sided." Duke angrily replied that "we can make it two-sided," and fol-
lowed Losada to the door. Losada left the room with Avent.

Duke filed a charge of harassment against Losada with Employee
Relations Representative Diane Whaley. He reported feeling harassed
because he had been startled by the suddenness with which Losada
opened the door and because Losada forced upon him literature he did
not want during his limited time for lunch. He stated that he was
"tired of this group having the right to approach him." Though she
had not interviewed Losada, Whaley gave Duke's complaint to
Employee Relations Manager Larry Williams. Williams referred the
matter to the PMPC because Consolidated's harassment policy was
implicated by the fact that Duke "clearly [was] offended" by Losada.

Williams opened the PMPC meeting by stating the allegations and
noting that the process could end in disciplinary action, including ter-
mination. During the meeting, Losada recognized that he could have
handled the situation differently, and Duke confessed that he had
probably "overreacted." Duke dropped the harassment charge against
Losada, and Williams said the Company would document in a sepa-
rate file that charges had been filed and withdrawn. In the proceedings
below, Consolidated conceded that it could reference and consider the
documentation for disciplinary purposes if future charges were filed
against Losada.

### 2.   *Jim Wrenn*

On the same day as the Losada-Duke incident, Losada and Avent
also distributed the Unity News in the paint team room. Jim Wrenn
later entered that room, asking the team members present whether
they needed any copies of the leaflet. When one said "no, but you can
have this one," Wrenn responded, "why are ya'll so blind," and began
arguing his point of view. Team member Kathy Mills told Wrenn that
those present did not want to hear what he had to say. During the
course of the incident, Wrenn referenced the team-based management
system and claimed credit for introducing the Martin Luther King hol-
iday at the plant. Tim Engleking, one of the team members present,
believed Wrenn had gestured to him when Wrenn said that "they" did
not want the Company to recognize the King holiday. Engleking
believed Wrenn was trying to create racial tension within the team

since Engleking was one of only two white males on an otherwise all-black team.

Engleking and Mills filed a charge of harassment against Wrenn with Employee Relations Representative Whaley. Engleking stated that Wrenn "should have asked if [it was] OK to talk about the union" and queried why Wrenn should "be able to approach people in their own team rooms." Engleking and Mills asserted that Wrenn "should have left when [Mills] said, '[W]e don't want to hear this.'" Without having interviewed Wrenn, Whaley gave their statements to Williams, who referred the matter to the PMPC on the ground that the complaining employees "were offended" by Wrenn's conduct.

The Committee met three times concerning the harassment charge. As at Losada's PMPC meeting, Williams opened by stating the allegations and indicating the possible disciplinary actions that might be taken against Wrenn, including termination. Williams also notified all parties that this meeting was not an "educational forewarning," which could serve as a basis for future discipline, but rather, a "documentation." During the course of the first meeting, Engleking, Mills, and Wrenn gave their version of events. After a series of meetings, the Committee decided to document in a separate file that an allegation of harassment had been made and that no action had been taken. As in the case of Losada, Consolidated conceded in the proceedings below that it could reference and consider the documentation for disciplinary purposes if future charges were filed against Wrenn.

## C.

Several employees reported observing Consolidated's security guards confiscating copies of the Unity News that had been left for employees in team rooms. Ethel Jones testified that, in October or November of 1995, she saw a security guard take several copies of the leaflet from a team room. Callen Parker testified that, in October of 1995, he observed a guard enter a team room and collect union literature. Zachary Means testified that, in September or October of 1995, a security guard interrupted a team meeting and took the acting coordinator out into the hallway. He then re-entered the room and informed the members present that he "would have to pick up" all of the union newsletters on a table. In response to an employee's inquiry

concerning his authority to collect the leaflets, the guard stated that any questions should be directed to the plant manager. The acting team manager subsequently told the employees that the guard had apologized, saying that he was not supposed to have picked up the literature.

D.

The Union filed multiple unfair labor practice charges against Consolidated between August 25, 1994 and February 6, 1996. An ALJ held a hearing on the consolidated complaint, subsequently finding that the Company had committed the unfair labor practices alleged. Consolidated filed exceptions with the Board, and the Union filed cross-exceptions.

A majority of the Board adopted the ALJ's finding that Consolidated violated § 8(a)(1) of the Act by subjecting Losada and Wrenn to a continued disciplinary process after it had become clear that their activity was protected by the Act. The Board unanimously adopted the ALJ's finding that the Company violated § 8(a)(1) by confiscating union literature placed in nonwork areas during nonwork time. The Board's order required Consolidated to cease and desist from (1) prohibiting employees from distributing union materials in nonwork areas during nonwork time; (2) removing from nonwork areas union materials which have been lawfully left there for distribution; (3) subjecting employees to its PMPC procedure for having engaged in protected activities; and (4) in any like or related manner interfering with, restraining, or coercing employees in the exercise of § 7 rights. Affirmatively, the order required the Company to (1) remove the PMPC documentation concerning Losada and Wrenn from its files; (2) notify them that such documentation had been removed and would not be used against them in any way; and (3) post a notice to employees that it would comply with every one of the above requirements.

Consolidated petitions for review, and the Board cross-applies for enforcement of its order.

II.

A.

We must affirm the Board's factual findings if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *see also Medeco Sec. Locks, Inc. v. NLRB*, 142 F.3d 733, 742 (4th Cir. 1998); *Fieldcrest Cannon, Inc. v. NLRB*, 97 F.3d 65, 69-70 (4th Cir. 1996). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Alpo Petfoods, Inc. v. NLRB*, 126 F.3d 246, 250 (4th Cir. 1997) (internal quotation omitted). If such evidence exists, we must uphold the Board's decision "even though we might have reached a different result had we heard the evidence in the first instance." *Id.* at 250 (internal quotation omitted). Moreover, we must affirm the Board's interpretations of the National Labor Relations Act if they are "rational and consistent" with it. *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 787 (1990).

B.

Section 7 of the Act provides that employees "have the right to self-organization, to form, join, or assist labor organizations, . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [§ 7]". 29 U.S.C. § 158(a)(1).

Soliciting support for a union and distributing union materials are among the core activities safeguarded by § 7. *See Beth Isr. Hosp. v. NLRB*, 437 U.S. 483, 491-92 (1978). The workplace is "uniquely appropriate" for such activities, *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 801 n.6 (1945), so long as the activities are conducted in nonwork areas during nonwork time, *Beth Isr. Hosp.*, 437 U.S. at 492, and in a non-abusive manner. *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 837 (1984).

If conduct protected by the Act is implicated, the test for a § 8(a)(1) violation is whether, "under all of the circumstances, the employer's

conduct may reasonably tend to coerce or intimidate employees." *NLRB v. Grand Canyon Mining Co.*, 116 F.3d 1039, 1044 (4th Cir. 1997). It makes no difference "whether the language or acts were coercive in actual fact." *Equitable Gas Co. v. NLRB*, 966 F.2d 861, 866 (4th Cir. 1992) (internal quotation omitted). Nor does it matter whether the employer acted with anti-union animus. *See Textile Workers Union v. Darlington Mfg. Co.*, 380 U.S. 263, 269 (1965). Instead, the relevant inquiry is "whether the conduct in question had a reasonable tendency in the totality of circumstances to intimidate." *Equitable Gas*, 966 F.2d at 866 (internal quotation omitted). Because "[w]hether particular conduct is coercive is a question essentially for the specialized experience of the NLRB," *Grand Canyon*, 116 F.3d at 1044 (internal quotation omitted), we show respect for its findings.

Nevertheless, establishing the existence of coercive conduct is not by itself dispositive. The Act does not require that an employer cease its legitimate business practices or suspend its proper disciplinary prerogatives. Rather, "[w]e must balance the employee's protected right against any substantial and legitimate business justification that the employer may give for the infringement." *Medeco*, 142 F.3d at 745. "[I]t is only when the interference with § 7 rights outweighs the business justification for the employer's action that § 8(a)(1) is violated." *Id.* (alteration in original) (internal quotation omitted). This judgment also falls within the expertise of the Board. *Medeco*, 142 F.3d at 745; *see also NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378 (1967). We therefore "must affirm the Board's balancing if it is rational and consistent with the Act." *Medeco*, 142 F.3d at 745.

III.

A.

We first determine whether activity protected by § 7 of the Act is implicated in the incidents giving rise to the harassment charges filed against Fernando Losada and Jim Wrenn. If it is, we then apply the test for a § 8(a)(1) violation to Consolidated's handling of those charges.

Substantial evidence supports the Board's finding that Losada was engaged in protected activity. In the one and only incident at issue,

Losada was distributing union flyers in a team room and talking with employees on break about the union when Duke apparently confronted him. At no time did Losada use abusive or profane language or threaten anyone with violence.

Similarly, substantial evidence supports the Board's finding that Wrenn's conduct was protected by § 7. He too was distributing union flyers in a team room and talking about the union when the heated exchange with Engleking took place. At no time did Wrenn use abusive or offensive language, or threaten anyone in any way. Even if he suggested that Engleking had been opposed to the Martin Luther King holiday, that issue is a term and condition of employment; discussion of it is therefore protected.

Consolidated does not contest the Board's finding that Losada and Wrenn were exercising their legitimate § 7 rights of solicitation and distribution. *See Beth Isr. Hosp.*, 437 U.S. at 491-92. Rather, it contends its handling of the matter was altogether free of coercion. *See Grand Canyon*, 116 F.3d at 1044. The Company maintains that, by subjecting Losada and Wrenn to its PMPC procedure, it was noncoercively investigating the charges against them in conformity with its policy's subjective definition of employee harassment. That is, Consolidated argues that the PMPC process constitutes a consensual, amicable investigatory tool, not a disciplinary device. Moreover, Consolidated maintains that its harassment policy embodies a legitimate business interest in maintaining harmonious relations within its workforce. *See Medeco*, 142 F.3d at 745. Since its harassment policy provides that "[a]ny unwelcome action, intended or not, which is considered offensive to the receiver or a third party may be labeled harassment," the Company suggests that what matters is that Duke and Engleking "felt" harassed.

As for Consolidated's characterization of its PMPC procedure, substantial evidence supports the Board's view that it is coercive. Losada and Wrenn were (1) subjected to it against their will; (2) required to defend themselves before it for doing nothing more than engaging in activity protected by § 7 of the Act; (3) informed at the outset that the process could result in termination; and (4) put on notice at the end that documentation of the meeting could be used against them in a future disciplinary proceeding. In these ways, the Company's conduct

"tend[ed] to coerce or intimidate employees." *Grand Canyon*, 116 F.3d at 1044.

As for Consolidated's reliance on its harassment policy, where harassment charges relate to conduct protected by § 7, an employer may not apply its policy in a manner that is inconsistent with controlling law. To be sure, employers enjoy broad authority to investigate facially valid charges of employee misconduct. Due process requires nothing less. Here, however, the Company's policy allocates initial investigative responsibility to one of its employee relations representatives, in these cases Diane Whaley. She reports the results of her inquiry to the employee relations manager, who decides whether to refer the matter to the PMPC. Because Whaley's initial investigation revealed beyond question that Losada and Wrenn had been doing nothing more than legitimately exercising core § 7 rights, we hold that Consolidated violated § 8(a)(1) by subjecting them to the Committee's coercive process, and by documenting the charges in its employment files for possible disciplinary use in the future. Where it is clear that employees are engaging in activity protected by the Act, no "substantial and legitimate business justification" exists for continuing to subject them to coercive proceedings on the basis of wholly subjective charges of harassment. *Medeco*, 142 F.3d at 745.

Were we to conclude otherwise, the statutory guarantee would be eviscerated. There would be nothing left of § 7 rights if every time employees exercised them in a way that was somehow offensive to someone, they were subject to coercive proceedings with the potential for expulsion. The fact that Duke and Engleking did not agree with the views of Losada and Wrenn is not dispositive. Section 7 rights are not that vulnerable to the heckler's veto. Implicit in the statutory guarantee of section 7 is an expressive right: the right to discuss the advantages of organizing. Losada and Wrenn did nothing more than discuss the pros and cons of union membership with fellow employees in nonwork areas during nonwork time. An environment where employees were prevented from discussing such a subject would be the antithesis of the workplace contemplated by the Act.

We emphatically do not hold that every purported exercise of § 7 rights immunizes an employee from disciplinary measures. If an employer is confronted with evidence of employee misconduct that

could objectively be considered harassment, then the Act does not prevent the employer from investigating the matter further and taking necessary disciplinary action. Losada and Wrenn, however, did nothing more than talk up the union with fellow employees. Neither man acted in an abusive, threatening, or intimidating manner. Yet both men were subjected to the Company's PMPC procedure for exercising core § 7 rights, merely because Duke and Engleking "felt" offended by them. Such a wholly subjective notion of harassment is unknown to the Act. *See, e.g.*, *Handicabs, Inc.*, 318 N.L.R.B. 890, 896 (1995), *enforced*, 95 F.3d 681, 684-85 (8th Cir. 1996).

## B.

Next we apply the test for a § 8(a)(1) violation to Consolidated's confiscations of union literature. To reiterate, distributing union literature is a core activity protected by § 7. *See Beth Isr. Hosp.*, 437 U.S. at 491-92. Thus, an employer may not confiscate union literature left for distribution to employees in nonwork areas during nonwork time. *See Delchamps, Inc.*, 330 N.L.R.B. No. 187, 2000 WL 487953, at *31 (April 21, 2000); *Vemco, Inc.*, 304 N.L.R.B. 911, 927 (1991), *enforced in rel. part*, 989 F.2d 1468 (6th Cir. 1993).

Consolidated does not dispute that, on more than one occasion, it confiscated union literature that was placed in nonwork areas during nonwork time. Rather, it contends that the confiscations were merely housekeeping removals of discarded materials, or, alternatively, *de minimis* infractions that were subsequently cured.

Of course, Consolidated has every right to keep its workplace clean. However, substantial evidence supports the Board's view that cleanliness was not at issue here. The three incidents of confiscation took place within a month or so of one another. In one of them, a security guard even interrupted a team meeting, informed the members present that he "would have to pick up" all the union literature on a table in their team room, and said that they should direct any questions to the plant manager. This action cannot possibly be characterized as either innocent housekeeping or a *de minimis* infraction. On the contrary, such behavior violates § 8(a)(1). Moreover, the violation was not cured by the guard's indirect apology to the acting team manager since Consolidated did not give the affected employees any

assurance that it would not repeat the illegal action. *See Hartley Oil Co.*, 326 N.L.R.B. 1111, 1114 (1998), *enforced*, 210 F.3d 361, 2000 WL 308998, at *3 (4th Cir. 2000) (table decision).

## IV.

For the foregoing reasons, we deny Consolidated's petition for review and grant the Board's cross-application for enforcement of its order.

*APPLICATION FOR ENFORCEMENT GRANTED*